NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

WHITE SUPERIOR DIVISION, WHITE
MOTOR CORPORATION, Respondent.

No. 18263.

United States Court of Appeals
Sixth Circuit.

Dec. 12, 1968.

Mary Griffin, N. L. R. B., Washington, D. C., for petitioner; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Assistant Gen. Counsel, Elliott Moore, Atty. N. L. R. B., Washington, D. C., on brief.

Robert V. Zener, Washington, D. C., for respondent; Robert A. Vaughn, Martin, Browne, Hull & Harper, Springfield, Ohio, on brief.

Before PHILLIPS, COMBS, and COFFIN*, Circuit Judges.

COFFIN, Circuit Judge.

This is a petition by the National Labor Relations Board for enforcement of its order against respondent, White Superior Division of the White Motor Corporation.

---

* The Honorable Frank M. Coffin, United States Circuit Judge, First Circuit, sitting by designation.

Respondent operates a diesel engine plant at Springfield, Ohio. Its production and maintenance workers are represented by four different unions, one of which is the International Association of Machinists (I.A.M.).

The respondent maintained its own guard force from 1940 until March 12, 1966. In the early spring of 1966 a majority of its ten plant guards authorized the I.A.M. to act as their bargaining agent. On March 7, 1966, the I.A.M. requested recognition as bargaining agent for the guards. On March 12, respondent announced that it was subcontracting out the guard work and that each member of the guard force would be transferred to work in production or maintenance if he so desired. Eight of the guards accepted transfers. All eight employees retained the same fringe benefits and six received the same wage.[1] All eight employees are apparently now members of the I.A.M.

On March 14, the respondent declined to recognize the I.A.M. as bargaining agent for the guards as was respondent's right under § 9(b) (3), National Labor Relations Act, 29 U.S.C. § 159(b) (3) (1964).[2]

On May 9, the eight transferred employees filed unfair labor practice charges with the Board alleging violations of § 8(a) (1) and § 8(a) (3) of the Act. Both the trial examiner and the Board found that respondent's subcontracting of the guard work and transfer of employees was done to discourage membership in a labor organization, violating §§ 8(a) (1) and 8(a) (3) of the Act.[3]

Accordingly, the Board ordered respondent to cease and desist from discouraging membership in the I.A.M. or any other labor organization and to reinstate the transferred employees in their position as guards.

But for the presence of § 9(b) (3) of the Act, this would be a relatively routine case. It is well-settled that an employer may not transfer employees with an eye to discouraging membership in a labor organization. See, e. g., NLRB v. Mrak Coal Co., 322 F.2d 311 (9th Cir. 1963); NLRB v. Merchant's Police, Inc., 313 F.2d 310 (7th Cir. 1963).

Respondent contends that this principle is inapplicable here because of § 9(b) (3). Respondent urges that since § 9(b) (3) was put into the statute in order to prevent an irreconcilable con-

---

1. Two employees received hourly pay decreases of 15¢ and 22¢ respectively. There was also evidence that some of the transferred employees experienced adjustment problems in their new jobs. For example, one of the employees took his vacation early due to the strain of the new work while the company looked for another job in which to place him.

2. § 9(b) (3) provides that:
"The Board shall decide in each case * * * the unit appropriate for the purposes of collective bargaining * * * *Provided*, That the Board shall not * * * (3) decide that any unit is appropriate for such purposes if it includes, together with other employees, any individual employed as a guard * * * but no labor organization shall be certified as the representatives of employees in a bargaining unit of guards if such organization admits to membership, or is affiliated directly or indirectly with an organization which

admits to membership, employees other than guards."
§ 9(b) (3) was put into the statute in 1947 by the Taft-Hartley Act and was clearly a response to the Supreme Court's decision in Jones & Laughlin Steel Co. v. NLRB, 331 U.S. 416, 67 S. Ct. 1274, 91 L.Ed. 1575 (1947).

3. Both before the Board and this court respondent argued that its conduct was justified by economic considerations. Its assertion of a saving of $25,000 a year was not contradicted, but the precipitate decision to subcontract after a quarter of a century together with statements made by respondent's officials adequately support the Board's findings that anti-union motives also played a part in respondent's actions. That they were not the sole factor is unavailing. It is enough if they were a contributing factor. NLRB v. National Food Stores, 332 F.2d 249 (7th Cir. 1964).

flict of interest between guards and non-guard employees which would arise if they were placed in the same bargaining unit, it follows that guards may not join a labor organization which also represents non-guard employees of the same employer.

At first glance this argument has some appeal, but, unfortunately for respondent, Congress chose to accommodate the interests of guards and employers in a different manner. Indeed, adoption of respondent's position is foreclosed by the legislative history of § 9(b) (3). The House version of the Taft-Hartley Act would have supported respondent's position by classifying guards as "supervisors", thereby removing them from the protection of the Act. However, the Senate version—the present § 9(b) (3)— was the resolution which finally emerged from conference. H.R.No.510, 80th Cong., 1st sess. (1947).

█ Thus, we think it is clear that § 9(b) (3) does not operate to prevent guard employees from joining a labor organization, and this principle extends to labor organizations which also represent non-guard employees.[4] Indeed, the real significance of § 9(b) (3) is the restrictions which it imposes on the Board. Specifically, § 9(b) (3) provides two things: (1) the Board may not determine that a unit is appropriate for purposes of collective bargaining if the unit includes both guards and non-guards; and (2) the Board may not certify a union as bargaining agent for guards if that union represents both guards and non-guards.

█ If guard employees do join a union which also represents non-guards, their membership is not unlawful, and in fact an employer may, if it wishes, recognize such a union for purposes of collective bargaining.

█ Since membership by guard employees in a union which also represents non-guards is not unlawful, it would be an unfair labor practice for an employer to take discriminatory action against guard employees on account of such membership.[5] That is not to say, however, that an employer may be compelled, directly or indirectly, to recognize such a union as bargaining agent for the guards. Indeed, we wish to make it abundantly clear that, absent respondent's consent, the I.A.M. may not represent the guards.

█ While it is not improper for a union in the position of the I.A.M. in this case to make an initial request for recognition as agent of the guards, it is important to realize that the request is one which, unlike most labor-management matters, the employer has the unqualified right to refuse, unilaterally. When an employer refuses recognition, the union may press its case no further. If this issue were to result in impasse in contract negotiations between the I.A.M. and respondent this might con-

---

4. Support for this principle is also found in the language of § 8(a) (3) of the Act. That section provides that it shall be an unfair labor practice for an employer:

"* * * by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in *any* labor organization." (Emphasis added.)

Congress having made no exception in § 8(a) (3) for membership in uncertified unions, this court is not an appropriate forum to urge the creation of such an exception.

5. It is true that the I.A.M. could never be certified as bargaining agent for the guards but this does not change the fact that the guards have a right under § 7 of the Act to be members of the I.A.M. To hold otherwise would attribute too much to certification. It would, in effect, be saying that no labor organization has rights under the Act save a certified one. Certification gives an organization which achieves it additional rights not all its rights. See United Mine Workers of America v. Arkansas Oak Flooring, 351 U.S. 62, 70–72, 76 S. Ct. 559, 100 L.Ed. 941 (1956); Brooks v. NLRB, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954); NLRB v. Kobritz, 193 F.2d 8 (1st Cir. 1951); § 9(c) (3); National Labor Relations Act, 29 U.S.C. § 159(c) (3) (1964).

stitute a violation of § 8(b) (3) of the Act. Moreover, under certain conditions, concerted action in support of such a demand might result in those actions being unprotected under the Act. In short, although guards may be members of the I.A.M., the policy of § 9(b) (3) dictates that such membership not bestow all the benefits normally associated with belonging to a labor organization. Under these circumstances, there would seem to be little sense in continued membership.

Although we are in agreement with the Board's decision, its order poses a more troublesome question. If respondent reinstates the guards as ordered, how long must the guard unit be retained and under what conditions may the guard work be subcontracted out? Clearly, respondent may subcontract out the guard work if not motivated by antiunion considerations. Of course, questions of motivation always pose uncertainties. Thus the expertise of the Board is given great weight in this area. In the final analysis, perhaps the only solution is to trust the Board's judgment in this matter, subject of course to review in this court.

This, admittedly, will necessitate a delicate assessment, weighing on the one hand the therapeutic effect of the passage of time on the earlier discriminatory motive and on the other the legitimate data and conclusions which may be relied upon to support a future decision to subcontract. This balance seems to be tipped, in a minor way, by the Board's action in modifying the Trial Examiner's Recommended Order by adding a paragraph requiring respondent to notify any affected employees who might be serving in the armed forces of their right to full reinstatement to their former or equivalent positions after their discharge. While this may be a standard provision applicable to most situations, this seems to us in this case to be an unnecessary prejudgment that the guard unit will endure for a matter of, perhaps, years. We believe that both fairness and the appearance of fairness will be advanced if the Board explicitly conditions such a future right of reinstatement on the continued existence of the guard unit. Not wishing to draft any specific provision and, for that matter, not knowing whether any of the affected employees are in the armed forces, we prefer to remand the matter to the Board for reconsideration in the light of these final comments.