**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**WHEELING ELECTRIC COMPANY, Respondent.**

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

v.

**WHEELING ELECTRIC POWER COMPANY, Petitioner.**

**Nos. 15220, 15270.**

United States Court of Appeals, Fourth Circuit.

Argued April 7, 1971.

Decided June 18, 1971.

Joseph E. Mayer, Atty., N.L.R.B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Allison W. Brown, Jr., and Arline Mendelson, Attys., N.L.R.B., on brief), for petitioner and respondent N.L.R.B.

Guy Farmer, Washington, D. C. (Patterson, Belknap, Farmer & Shibley, Washington, D. C., on brief), for respondent Wheeling Electric Co. and petitioner Wheeling Electric Power Co.

Before WINTER, CRAVEN, and BUTZNER, Circuit Judges.

CRAVEN, Circuit Judge.

This is an appeal from a decision of the National Labor Relations Board that the Wheeling Electric Company violated Section 8(a) (1) of the National Labor Relations Act, 29 U.S.C. § 158(a) (1), by discharging and refusing to rehire a confidential secretary who refused to perform her duties during a strike. We think confidential secretaries are not within the protection of the Act, and deny enforcement of the Board's order to reinstate.

The parties agree that Mrs. Imogene McConnell was the confidential secretary to the manager of the company's Moundsville, West Virginia, office, and that she was not a union member because of the confidential nature of her employment. Nevertheless, because of personal sympathies (Mrs. McConnell's husband was an official of another union not involved), she refused to cross union picket lines during a strike and was fired for it. Under the theory that her refusal to come to work under the circumstances was protected concerted activity, the Board found an 8(a) (1) violation. Whether Mrs. McConnell is within the protection of the Act depends upon whether she was an "employee" within the meaning of the Act. On its face she would appear to be within the statutory definition. Section 2(3) reads:

> The term "employee" shall include any employee, and shall not be limited to the employees of a particular employer, unless this subchapter explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, but shall not include * * any individual employed as a supervisor. * * *

29 U.S.C. § 152(3).

Apparently, that is as far as the Board got. It did not adequately consider legislative history, or considering it, failed to grasp its significance in light of the Board's own prior decisions. Where legislative intent is perfectly clear, it should be accorded effect whether or not there is patent ambiguity in

the statute itself. See, *e. g.* Pridemark, Inc. v. Commissioner of Internal Revenue, 345 F.2d 35, 40–41 (4th Cir. 1965).

When Congress redefined "employee" in 1947 (Section 2(3)) it excluded supervisors [1] from the Act's coverage, "thereby reversing a series of decisions in which the Board held, not only that the original Act guaranteed foremen the right to organize and bargain collectively, but also that they were authorized to bargain, if they wished, through the very union which represented their subordinates." Cox, The Labor Management Relations Act, 61 Harv.L.Rev. 1, 4–5 (1947). The original House version of the bill, while excluding supervisors from coverage under the Act, had also excluded confidential employees [2] by including them in the definition of "supervisor." H.R. 3020, 80th Cong., 1st Sess. (1947). The Senate passed an amended version that did not specifically mention confidential employees as being within the "supervisor" exemption. 93 Cong.Rec. 6371 (1947). The bill subsequently went to conference in which the Senate version was adopted. The conference report explained the basis for the compromise:

The conference agreement, in the definition of supervisor, limits such term to those individuals treated as supervisors under the Senate amendment. In the case of persons working in the labor relations personnel and employment departments, it was not thought necessary to make specific provision, as was done in the House bill, since the Board has treated, and presumably will continue to treat, such persons as *outside the scope of the Act. This is the prevailing Board practice with respect to such people as confidential secretaries as well, and it was not the intention of the conferees to alter this practice in any respect.*

93 Cong.Rec. 6371 (1947). (Emphasis added.)

The entire report was submitted to both houses of Congress and accepted on this hypothesis. 93 Cong.Rec. 6392–93, 6535–36 (1947).

The Board urges, however, that the Congress was mistaken about Board practice before the 1947 amendments, and that in fact the Board had never excluded confidential employees from the protection of the Act, but that it merely prohibited their membership in bargaining units with other non-confidential employees.[3] This practice, it is argued, does not in itself signify their exclusion from the Act's coverage since the Board had on occasion implied that confidential employees were free to organize themselves into bargaining units. See, Southern Colorado Power Co., 13 NLRB 699, 719 (1939). It is the Board's position that if Congress failed to exclude confidential secretaries under the mistaken impression that the Board had and would continue to do so, the Board is then free to ignore the plainly expressed intent of the Congress. Whatever may be said of the implicit affront

1. The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires use of independent judgment.
29 U.S.C. § 152(11).

2. The Board defines confidential employee as those "who assist and act in a confidential capacity to persons who formulate, determine, and effectuate management policies in the field of labor relations." B. F. Goodrich Co., 115 NLRB 722, 724 (1956). See also, AFC Industries, 115 NLRB No. 173 (1956).

3. See, e. g. Landish Co., 178 NLRB No. 5 (1969); Westinghouse Electric Corp., 138 NLRB No. 90 (1962); AFC Industries, Inc., 115 NLRB No. 173 (1956); B. F. Goodrich Co., 115 NLRB No. 103; Minneapolis-Moline Co., 85 NLRB No. 109 (1949); Ford Motor Co., 66 NLRB 1317 (1946).

to the Congress, the Board's position is not without logic: that a failure to legislate (to exclude confidential employees) out of ignorance is still a failure to legislate.

"But whatever may be said of the rule of strict construction, it cannot provide a substitute for common sense, precedent, and legislative history." United States v. Standard Oil Co., 384 U.S. 224, 225, 86 S.Ct. 1427, 1428, 16 L.Ed.2d 492 (1966) "The starting point for determining legislative purpose is plainly an appreciation of the 'mischief' that Congress was seeking to alleviate." ICC v. J—T Transport Co., 368 U.S. 81, 107, 82 S.Ct. 204, 223, 7 L.Ed.2d 147 (Frankfurter, J., dissenting).

■ We think the Congress was aware of and correctly interpreted prior Board decisions and practice. Although we may not rewrite a statute nor incorporate in it the provisions of a conference report, we are free to interpret the word "supervisor" in light of legislative history. "[W]hen the reason given for not changing [a law] is that the evil adverted to can be dealt with adequately under existing law, this may be considered by the courts in interpreting a doubtful provision of existing law." Pridemark, Inc. v. Commissioner of Internal Revenue, supra, 345 F.2d at 41, n. 5. On the basis of clear legislative intent we hold that "supervisors" within the context of the statute included confidential secretaries so as to leave their concerted activity for the benefit of rank-and-file employees unprotected by the Act.

Before the 1947 Amendments, in a five to four decision, the Supreme Court included supervisors within the meaning of "employee" finding that there was "nothing in the Act which indicat[ed] that Congress intended to deny its benefits to foremen as employees * *." Packard Motor Co. v. NLRB, 330 U.S. 485, 490, 67 S.Ct. 789, 792, 91 L.Ed. 1040

(1947). There is admittedly nothing in the amended Act which explicitly indicates that confidential employees are to be excluded from its coverage. But there is a congressionally expressed reason for that omission plus a clear expression of a legislative intention to exclude them from the Act. That is enough.

The question is not whether a confidential employee may join in or participate with a rank-and-file union, but whether he may be fired for it. Simply saying, as the Board does, that confidential employees have always been given the right to self-organization in spite of their exclusion from ordinary bargaining units does not answer the question. Supervisors, who are explicitly excluded from the Act's protection, are given that privilege under Section 14(a) of the Act.

Nothing herein shall prohibit any individual employed as a supervisor from becoming or remaining a member of a labor organization, but no employer subject to this subchapter shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law, either national or local, relating to collective bargaining.

29 U.S.C. § 164(a).

The Board admits it has aways excluded confidential employees from rank-and-file bargaining units. However, it does not point to a single case in which the Board has certified a bargaining unit made up entirely of confidential employees. The treatment of confidential employees by the Board before 1947 could therefore be properly construed by the Congress as it did—that they were not to be afforded the protection of the Act. We think, additionally, that the Board's continued practice after the enactment of the 1947 Amendments can also be properly construed as treating confidential employees in accordance with the intended scope of the Act, i. e. as "supervisors." [4]

4. Compare NLRB v. Southern Greyhound Lines, 426 F.2d 1299 (5th Cir. 1970), where, in circumstances similar to the instant case, a confidential employee was afforded protection under the Act for concerted activity (refusal to cross a

■ The cardinal rule of statutory construction is that the intent of the legislative assembly is to be given effect. Usually, that intent may be found in the statute itself. But statutes are "contextual as well as textual," Argosy Limited v. Hennigan, 404 F.2d 14, 20 (5th Cir. 1968), and where a literal interpretation of a statutory provision would not accord with the intended purpose of the legislation, District of Columbia v. Orleans, 132 U.S.App.D.C. 139, 406 F.2d 957, 958 (1968), or produces an absurd result, United States v. American Trucking Assns., 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940), courts must look beyond the plain words of the statute. *See,* Salt River Project v. FPC, 129 U.S.App.D.C. 117, 391 F.2d 470 (1968). "Statutes * * * are not inert exercises in literary composition. They are instruments of government, and in construing them 'the general purpose is a more important aid to the meaning than any rule which grammar or formal logic may lay down.'" (Frankfurter, J., speaking for the Court) (citations omitted). United States v. Shirey, 359 U.S. 255, 260–261, 79 S.Ct. 746, 3 L.Ed.2d 789 (1959).

It is a familiar maxim of statutory interpretation that courts should enforce a statute in such a manner that its overriding purpose will be achieved, even if the words used leave room for a contrary interpretation.

Haberman v. Finch, 418 F.2d 664, 666 (2d Cir. 1969).

In Crosse & Blackwell Co. v. FTC, 262 F.2d 600 (4th Cir. 1959), the well-known food products manufacturer challenged the jurisdiction of the Federal Trade Commission after the FTC had charged it with certain Clayton Act violations. Since approximately three per cent of its sales involved products containing meat or meat products, Crosse & Blackwell urged that as a meat packer "exclusive jurisdiction to question its trade practices, with respect to *all* of its products, [was] lodged in the Secretary of Agriculture, and that such jurisdiction [had] been wholly withdrawn from the Federal Trade Commission" under the Packers and Stockyards Act of 1921, 7 U.S.C.A. §§ 226–227 and the Federal Trade Commission Act, 15 U.S.C.A. § 45(a) (6), 262 F.2d at 602 (emphasis added). Crosse & Blackwell fell within the literal language of the Packers and Stockyards Act as one "engaged in the business * * * of manufacturing or preparing * * * meat food products for sale or shipment in commerce * *" 7 U.S.C.A. § 191. In rejecting a literal application of the Act that would withdraw *all* of Crosse & Blackwell's operations from FTC jurisdiction, Chief Judge Haynsworth said:

We construe the Act, as we must, to effectuate the apparent purpose and intention of the Congress * * * A literal interpretation of the exemption * * * must be laid aside for it is "plainly at variance with the policy of the legislation as a whole," * * * and if held to grant a more extensive exemption than the Secretary's regulatory power would produce an absurd result. * * *

262 F.2d 605–606. *See also,* Lynch v. Overholser, 369 U.S. 705, 710, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962); Miller v. Amusement Enterprises, Inc., 394 F.2d 342, 350 (5th Cir. 1968); United States v. Ivey, 294 F.2d 799, 803 (5th Cir.

picket line). Reliance was placed on NLRB v. Poultrymen's Service Corp., 138 F.2d 204 (3rd Cir. 1943), decided *before* the 1947 Amendments, where the court stated, without citing authority, that the exclusion of a confidential employee from a bargaining unit "does not deprive her of the benefits of the Act." 138 F.2d at 210. Significantly absent in the court's opinion in *Southern Grey-* *hound, supra,* is any reference to the legislative history of the 1947 Amendments. The Trial Examiner's decision in this case indicates that in proceedings before the Board in *Southern Greyhound* "the parties, in effect, stipulated that confidential employees are covered by Section 7." If this is so, then the critical issue here was not actually litigated before the Board of the Fifth Circuit.

1961); Newark v. United States, 254 F. 2d 93, 97 (3rd Cir. 1958).

The exclusion of confidential employees from the protection of the Act is consistent with the Act's primary purpose of promoting industrial harmony through collective bargaining. 29 U.S.C. § 151. "The purpose of federal labor legislation is to reconcile and, insofar as possible, equalize the power of competing economic forces within the society in order to encourage the making of voluntary agreements governing labor-management relations and prevent industrial strife." Pittsburgh Plate Glass Co. v. NLRB, 427 F.2d 936, 946 (6th Cir. 1970). It is obviously consistent with this purpose to exclude confidential employees from membership in ordinary representative units to prevent unfairness to the employer.

It would be patently unfair to require the company to bargain with a union that contains such an employee. As the Board has put it, "management should not be required to handle labor relations matters through employees who are represented by the union with which the company is required to deal and who in the normal performance of their duties may obtain advance information of the company's position with regard to contract negotiations, the disposition of grievances, or other labor relations matters." The Hoover Company, 55 NLRB 1321, 1323 (1944). NLRB v. Quaker City Life Insurance Co., 319 F.2d 690, 694 (4th Cir. 1963).

It strikes us as nonsense for the Board to exclude Mrs. McConnell from membership in the bargaining unit *and then* extend to her the same protection for the same concerted activity that she would have enjoyed if a union member. If Mrs. McConnell is committed to the union cause to the extent she joins the strike by refusing to cross the picket line, it would seem to matter little to the company that she is not technically a union member. A confidential secretary who plights her troth with the union differs in form, but not in substance, from one who holds a union card. Since she cannot formally join the unit, there

is nothing incongruous in holding that she cannot "plight her troth" with the unit. Indeed, it seems more consistent to say that if she cannot act in concert by participating in the unit, then she cannot act in concert on an informal basis, or more accurately, that if she does so, it will be without the protection of the Act. Management is entitled to security of its confidential information and may insist upon the loyalty of those employees who have access to it. For this reason, confidential employees cannot be granted the protection afforded ordinary employees under the Act. Like supervisors, "such loyalty cannot be secured if [they] are psychologically allied with, or subject to the pressures of their union on behalf of, the rank and file." *Cox, supra* at 5. See, NLRB v. Retail Clerks International, 211 F.2d 759, 763–764 (9th Cir. 1954).

For the foregoing reasons, we deny enforcement of the Board's order.

Enforcement denied.