NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

BEL-AIR MART, INC., a Subsidiary of
Mammoth Mart, Inc., Respondent.

No. 73-1826.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 6, 1974.

Decided May 16, 1974.

Robert Dashiell, Atty., N. L. R. B., (Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Jay E. Shanklin, Atty., N. L. R. B., on brief), for petitioner.

Milton M. Konowe, New York City (Katz & Wolchok and Sidney S. Wolchok, New York City, on brief), for respondent.

Before CRAVEN, RUSSELL, and FIELD, Circuit Judges.

CRAVEN, Circuit Judge:

The National Labor Relations Board seeks enforcement, pursuant to section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e), of its order finding that respondent, Bel-Air Mart, Inc., committed unfair labor practices in violation of sections 8(a)(1) and 8(a)(3), 29 U.S.C. §§ 158(a)(1) and (a)(3). Because we agree that substantial evidence supports the finding as to the 8(a)(1) violation and that the 8(a)(3) violation occurred with respect to activity of an employee which was protected under section 7 of the Act, 29 U.S.C. § 157, we enforce the Board's order.

## I. The 8(a)(1) Violation

■ Bel-Air Mart (the company) operates a discount department store in Belair, Maryland, and employs approximately 90 persons in various capacities —managers, supervisors, clerks, and guards. Mrs. Dorothy Himmelman, a clerk, became actively involved during March and April 1972 in encouraging her fellow employees to join Local 692 of the Retail Store Employees Union. The Administrative Law Judge determined, and the Board agreed, that the company committed an unfair labor practice [1] by (1) incessant surveillance of her activities together with other related forms of harassment, (2) promising her benefits if she would cease supporting the union, and (3) coercively interrogating her concerning union activities. Mrs. Himmelman's testimony in this regard is uncontradicted and provides substantial evidence of an unfair labor practice. The company does not seriously contend otherwise, limiting argument in its brief to pointing out that a conversation which the Board alleged to have occurred between Himmelman and Leavitt, the store manager, was actually between Himmelman and the personnel manager, Lerner.[2] Since both are management representatives, the Board's mistake is of no great consequence. The Board's order as to the 8(a)(1) violation is clearly supported by substantial evidence.

## II. The 8(a)(3) Violation

Beginning October 31, 1969, James Pilachowski was employed by the company as a uniformed guard. According to Pilachowski's testimony his duties entailed "[g]reeting customers when they [came] in, being on the lookout for shoplifting, mak[ing] sure that all doors were closed and locked at nighttime when we closed up, and also taking deposits to the bank." Pilachowski further agreed that his duties involved not only surveillance of customers to prevent shoplifting but also observation of employees to prevent theft by them as well.

On the evening of April 5, 1972, Pilachowski attended a union meeting. A few days later he, along with other guards and supervisory personnel, were warned by personnel manager Lerner that they were "considered management" and that they "were to offer no opinion to the girls as to whether or not they [the clerks] should join."[3] On

---

1. Section 8(a), 29 U.S.C. § 158(a), provides: It shall be an unfair labor practice for an employer—
   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
   . . .

2. This error was subsequently corrected by the Board.

3. Lerner's testimony as to the content of this initial warning varies somewhat from Pilachowski's recollection. Lerner testified that he specifically warned the "management team," including the guards, that they were not to attend any union meetings. This warning took place on April 5 and was followed by another warning on April 12, after Lerner was apprised that a security guard

April 12 Pilachowski attended a second meeting. His presence was disclosed to Leavitt (store manager) on April 17; Leavitt called Pilachowski to his office and questioned him about his attendance. Pilachowski readily admitted that he had gone to the meeting, whereupon, on Lerner's orders, Leavitt discharged him "for violating company policy." Whether there was one warning, as Pilachowski testified, or two, as Lerner claimed, prior to Pilachowski's discharge, and whether that warning specifically informed Pilachowski that he was not to attend union meetings is of little moment. The company admits that Pilachowski was discharged solely for the reason that he attended the two meetings.

Section 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(3), declares it to be an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ." In discharging Pilachowski, the company was found by the Board to have committed an 8(a)(3) violation as well as an infringement of section 8(a)(1) proscribing interference by employers with the exercise of employees' section 7 rights.[4]

■ The company counters with the assertion that attendance at union meetings by a guard is not protected activity because the guard is an agent of the employer who must maintain a "strictly neutral attitude" in a union organizational campaign. The company must be able to prevent such attendance, it is argued, in order to insulate itself from liability against charges of surveillance, coercion or other unfair labor practices attributable to it through the acts of its agents. Relying on section 2(13) of the LMRA,[5] the company pictures itself in the doleful dilemma of violating section 8(a)(1) if the security guard attends the union meeting and transgressing section 8(a)(3) if he is forbidden to attend. But Bel-Air's plight is more theoretical than real for section 2(13) purports only to state a general principle of the law of agency—that the authority of an agent may be implied from the conditions and circumstances of his employment and that specific acts, to be within the scope of that authorized, need not be either expressly authorized by the principal or ratified by him. It does not purport to create a per se rule that guards are agents of their employers for all purposes and at all times. *Cf.* National Paper Co., 102 N.L.R.B. 1569, 31 L.R.R.M. (1953), enforcement denied, 216 F.2d 859 (5th Cir. 1954); Harrison Sheet Steel Co., 94 N.L.R.B. 81, 28 L.R.R.M. 1012 (1951). Bel-Air's position is not as dilemmatic as we are asked to believe.

Respondent's argument goes further, however, and seeks to escape the purported quandary by defining guards as "management." In terms of the LMRA, Bel-Air contends that Pilachowski must be considered a "supervisor" within the

---

had attended the April 5 meeting. Lerner testified to the substance of the April 12 warning as follows:

> I had made all management, as well as Mr. Pilachowski, aware that if they violated company policy and attended any meetings, or made any opinions, that would be cause for immediate dismissal.

4. Section 7, 29 U.S.C. § 157, provides in pertinent part:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted

activities for the purpose of collective bargaining or other mutual aid or protection . . . .

> It cannot be gainsaid that the right to attend a union meeting is encompassed by the broad terms of section 7.

5. Section 2(13), 29 U.S.C. § 152(13), recites:

> In determining whether any person is acting as an "agent" of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling.

meaning of section 2(11), 29 U.S.C. § 152(11), rather than an "employee" within section 2(3), 29 U.S.C. § 152(3). Such a classification would strip Pilachowski of the rights guaranteed "employees" under section 7 and validate his discharge by Bel-Air. This denomination by the company is bottomed upon its interpretation of the legislative history of the Taft-Hartley Act and of section 9(b)(3) of the Act, 29 U.S.C. § 159(b)(3).

Respondent's legislative history is awry. While it is certainly true that "[p]lant policemen and guards" were referred to as an extension of management in the House Report on the Act,[6] it is also clear that the sweeping definition of "supervisors" envisioned in the House bill was considerably circumscribed by the Senate's version.[7] The conference committee specifically adopted the Senate modification:

> [B]oth the House bill and the Senate amendment excluded supervisors from the individuals who are to be considered employees for the purposes of the act. The House bill defined as "supervisors", however, certain categories of employees who were not treated as supervisors under the Senate amendment. These were generally . . . (B) labor relations personnel, police, and claims personnel . . . . The Senate amendment confined the definition of "supervisor" to individuals generally regarded as foremen and persons of like or higher rank.

The conference agreement, in the definition of "supervisor," limits such term to those individuals treated as supervisors under the Senate amendment.

H.R.Rep.No.510, 80th Cong., 1st Sess. 35 (1947) (Conference Report), U.S.Code Cong.Serv. p. 1141.

The adoption of the Senate variant is not entirely conclusive of the matter. In NLRB v. Wheeling Electric Co., 444 F.2d 783 (4th Cir. 1971), we faced an analogous question pertaining to the status of confidential secretaries. Like guards, confidential employees had been included within the House definition of "supervisor." While specific mention of this category of employee, like the guard category, was dropped from the Senate's more general definition of "supervisor," the legislative history plainly indicated that the bill was not intended to alter the Board's prior practice of treating confidential secretaries as personnel outside the scope of the Wagner Act. See H.R.Rep.No.510 at 35; Wheeling Electric, supra, 444 F.2d at 785; NLRB v. Bell Aerospace Co., —— U.S. ——, 94 S.Ct. 1757, 40 L.Ed.2d 134, 42 U.S.L.W. 4564, 4569 (1974). As to guards, however, the legislative history reveals a different tack. Prior practice in the guard context—segregating plant guards in separate bargaining units but allowing the same union to represent guard and non-guard employees—is quite dissimilar from the Board's approach to confidential secretaries. See e. g., NLRB v. E. C. Atkins & Co., 331 U.S. 398, 67 S.Ct. 1265, 91 L.Ed. 1563 (1946); NLRB v. Jones & Laughlin Steel Corp., 331 U.S. 416, 67 S.Ct. 1274, 91 L.Ed. 1575 (1946).[8] Recognizing the

---

6. H.R.Rep.No.245, 80th Cong., 1st Sess. 16 (1947). The House definition of "supervisor" was, in relevant part, as follows :
   The term "supervisor" means any individual—

   (B) who is employed in labor relations, personnel, employment, police, or time-study matters . . . .

   H.R.Rep.No.245 at 49–50.

7. Now codified as 29 U.S.C. § 152(11), the Senate definition read :

The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

8. The Supreme Court in *Jones & Laughlin* recognized the Board's interpretation.

Board's distinction between the two categories, the Senate amendment adopted a statutory approach aimed at eliminating what was perceived to be the danger of earlier Board practice while at the same time preserving the rights of guards under the NLRA. The conference committee concurred with the Senate and the result was section 9(b)(3), 29 U.S.C. § 159(b)(3):

> (b) The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof: *Provided,* That the Board shall not . . . (3) decide that any unit is appropriate for such purposes if it includes, together with other employees, any individual employed as a guard to enforce against employees and other persons rules to protect property of the employer or to protect the safety of persons on the employer's premises; but no labor organization shall be certified as the representative of employees in a bargaining unit of guards if such organization admits to membership, or is affiliated directly or indirectly with an organization which admits to membership, employees other than guards.

Respondent argues that Congress could not have intended that the word "employee" mean one thing for purposes of determining a proper bargaining unit and something else in determining which employees are protected from being fired for union activity.[9] We think otherwise. Compromise has its own logic. Under this compromise, guards are "employees" within the meaning of section 2(3) and possess the same rights as non-guard employees under section 7. Guards' employee rights are not limited by the terms of the Act; the only limitation is the elimination of *the Board's power* to certify two types of bargaining units—(1) those containing both guard and non-guard employees, and (2) those containing only guards but which are represented by or affiliated with the same union which represents other bargaining units containing non-guard employees of the same employer.

Once again, an ear to the legislative history is dispositive of a contrary interpretation. In a summary of the principal differences between the Senate bill and the later conference agreement, Senator Taft, the Act's chief spokesman in the Senate, declared:

> Under the language of clause (3), guards still retain their rights as employees under the National Labor Relations Act, but the Board is instructed not to place them in the same bargaining unit with other employees, or to certify as bargaining representatives for the guards a union which admits other employees to membership or is affiliated directly or indirectly with labor organizations admitting employees other than guards to membership.

93 Cong.Rec. 6444 (1947).[10] The intent of section 9(b)(3) is further clarified

---

Where the private employer retains the right to fix the wages, hours or other working conditions of such guards, the Board's uniform conclusion has been that they are employees of the private employer *and that they retain their rights under the National Labor Relations Act.*
331 U.S. at 428 (emphasis added).

9. Respondent's reliance upon NLRB v. North Arkansas Electrical Cooperative, Inc., 446 F.2d 602 (8th Cir. 1971), is misplaced. That case dealt with the "managerial employee," a category treated precisely as was the "confidential secretary" in the Act's legislative history. *North Arkansas* is thus

distinguishable from the present case in the same manner as *Wheeling Electric, supra. Accord,* NLRB v. Bell Aerospace Co., —— U.S. ——, 94 S.Ct. 1757, 40 L.Ed.2d 134, 42 U.S.L.W. 4564, 4568–71 (1974).

10. Senator Taft's remarks revealed the conferees' agreement with the Sixth Circuit's decision in NLRB v. Jones & Laughlin Steel Corp., 154 F.2d 932, rev'd 331 U.S. 416, 67 S.Ct. 1274, 91 L.Ed. 1575 (1946), which refused to enforce a Board order which would have permitted the same union representing production employees to represent a separate bargaining unit consisting of plant guards. 93 Cong.Rec. 6444.

by an exchange between Senator Taft and Senator Murray. After Senator Murray described section 9(b)(3) as "a petulant gesture at the Supreme Court" which had "no justification other than a wish to belittle a tribunal which is a co-ordinate branch of this Government and, as such, is entitled to the respect of the Congress," Senator Taft responded:

> By the provision of the House bill plant guards were completely excluded from the Wagner Act. We compromised with the House by providing that they should have the protection of the Wagner Act, but in a separate unit from the workers in the plants. That is certainly a change—although a minor one, nevertheless a reasonable one—and certainly it is a compromise with the extreme position taken by the House.

93 Cong.Rec. 6499 (1947).[11] *See also,* H.R.Rep.No.510, 80th Cong., 1st Sess. 47–48 (1947) (Conference Report), U. S.Code Cong.Serv. p. 1135; 93 Cong.Rec. 6442 (1947) (remarks of Senator Taft); 93 Cong.Rec. 6534 (1947) (statement of the House managers); 93 Cong.Rec. 6504 (1947) (analysis of Title I of the Act by Senator Murray). We conclude that the legislative history of sections 2(11) and 9(b)(3) leaves no doubt that guards are "employees" within the meaning of section 2(3) and that they retain the full panoply of rights granted to non-guard employees by section 7. Section 9(b)(3) is a limitation not upon employee rights but upon Board powers.

This conclusion is undergirded by several analogous lower court holdings. In Rock-Hill-Uris, Inc. v. McLeod, 236 F. Supp. 395 (S.D.N.Y.1964), aff'd 344 F. 2d 697 (2d Cir. 1965), plaintiff-employer sought to exclude two unions from the ballot in an election to determine the bargaining representative for its security officers and watchmen. Its opposition was grounded upon section 9(b)(3) which would have prohibited the Board from certifying either union. The district court rejected the plaintiff's contention and refused to enjoin the election, declaring:

> [N]owhere does the Act proscribe such a union from representing the guards. They retain the right to select a mixed union to represent them; the employer may voluntarily recognize such a union—as, in fact, the plaintiffs have in the instant case— and may even be forced to do so by the exertion of the union's economic power. *Thus, while the statute forecloses certification by the Board of a disqualified union, it does not deprive the guards of the right granted under Section 7 "to bargain collectively through representatives of their own choosing."*

236 F.Supp. at 398 (emphasis added).[12]

Closer to the situation before us is that faced by the Sixth Circuit in NLRB v. White Superior Division, 404 F.2d 1100 (1968). Respondent White had maintained its own guard force for 26 years prior to 1966. In that year a majority of its ten-guard force authorized the International Association of Machinists to represent them—the same

11. Senator Taft added, in response to Senator Murray's charge that the change was "put in arbitrarily," that:
[T]he Supreme Court's opinion to which the Senator has referred was only a 5-4 opinion, and the dissenting opinion was about as good as the majority opinion.
93 Cong.Rec. 6499 (1947).

12. The court's *dicta* that the unqualified union might exert economic power to force the employer to "voluntarily" recognize it has been eroded by McLeod v. Security Guards and Watchmen, 333 F.Supp. 768 (S.D.N.Y. 1971), at least so far as recognitional picketing is concerned. In enjoining such picketing by a union disqualified from certification as the representative of a guard unit because it also represented a non-guard unit, the district court recognized that failure to grant relief would "grant to a disqualified union greater freedom of action to picket than Congress has permitted to those unions clearly qualified to have a certification election." 333 F.Supp. at 771. This does not detract, however, from the *Rock-Hill-Uris* conclusion that section 9(b)(3) does not take away section 7 rights, only that section 9(b)(3) cannot be utilized to grant additional rights.

union which represented White's production and maintenance workers. Five days after I.A.M. requested recognition as the guards' bargaining agent, the company subcontracted out its guard work, allowing the former guards to accept transfers to production or maintenance with the same fringe benefits and, as to six of the eight who accepted transfer, the same wage. In agreeing that White's conduct constituted an unfair labor practice under section 8(a)(3), the court placed emphasis upon the legislative history of section 9(b)(3) together with the language of section 8(a)(3) which proscribed encouragement or discouragement of membership "in *any* labor organization." 404 F.2d at 1103 and n. 4. Judge Coffin concluded:

> [W]e think it is clear that § 9(b)(3) does not operate to prevent guard employees from joining a labor organization, and this principle extends to labor organizations which also represent non-guard employees. Indeed, the real significance of § 9(b)(3) is the restriction which it imposes on the Board.

404 F.2d at 1103. If section 9(b)(3) does not prevent guards from *joining* the same union which represents the employer's non-guard employees, how can it be said that the same section prevents a guard from merely attending that union's meetings? We conclude that store guard Pilachowski was exercising rights reserved to him as a section 2(3) employee by section 7 of the NLRA and that the company's discharge of him solely for the reason of his attendance was an unfair labor practice within the meaning of sections 8(a)(1) and (a)(3).

Despite this holding, we cannot fail to recognize the incongruous result which, in part, led us to an opposite conclusion with respect to the confidential secretary in *Wheeling Electric*. We said:

> It strikes us as nonsense for the Board to exclude Mrs. McConnell from membership in the bargaining unit *and then* extend to her the same protection for the same concerted activity that she would have enjoyed if a union member.

444 F.2d at 788. While the Board's action here is not "nonsense," [13] it serves a very limited purpose. The right of the guard which we here protect has little practical value aside from the rare instance when an employer voluntarily chooses to bargain with a union which could not be certified, *see Rock-Hill-Uris, supra,* 236 F.Supp. at 398; *White Superior, supra,* 404 F.2d at 1103–1104; *Radio Corp. of America,* 173 N.L.R.B. No. 72, 69 L.R.R.M. 1368, 1373 (October 29, 1968), or where attendance at the meeting "educates" the guard to the benefits of unionism, though such benefits are later obtained only by membership in a separate, certifiable union. But even though section 7 rights in this context may be of little value, the legislative history is that such rights were the intended product of compromise.

13. The situations are not precisely the same. Since the confidential secretary, due to prior Board practice, could under no circumstances be a member of the same bargaining unit as the employees whose picket line she refused to cross, no benefits could flow to her from such activity and her section 7 rights, if they existed, were valueless *to her*. In this case assertion of the right by Pilachowski could lead to some benefit to him, *i. e.,* the employer might choose to voluntarily recognize a mixed bargaining unit of guards and non-guards.

The underlying distinction goes to the differing functions of the two job categories and Congress' assessment of those functions. The reason for eliminating section 7 rights as to one group while preserving them as to another, whether arrived at by deference to the Board's prior practice or through an independent judgment of the Congress, can properly be characterized, we think, as stemming from a conviction that confidential employees—as their label suggests—occupy a position so closely intertwined with management's interests that divided loyalties could not be suffered. Guards, on the other hand, are ordinarily not so privy to management secrets.

The Board's order that Pilachowski be reinstated with compensation for loss of earnings together with the usual cease and desist and notice requirements is enforced.

Order enforced.