In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2577

General Service Employees Union,
Local No. 73, SEIU, AFL-CIO, CLC,

Petitioner,

v.

National Labor Relations Board,

Respondent.

Petition to Set Aside Decision
of the National Labor Relations Board.
Nos. 13 CA 33078 & 13 CA 33382

Argued February 10, 2000--Decided October 16, 2000

  Before Flaum, Chief Judge, and Coffey and Diane P.
Wood, Circuit Judges.

  Diane P. Wood, Circuit Judge.  The National Labor
Relations Act (the Act) sets forth the general
framework under which employees and management
structure their relationships, whether in a union
context or a non-union context. This case
requires us to decide whether the Board strayed
beyond the permissible boundaries of
interpretation of the Act when it decided that a
prohibition against certification of so-called
mixed unions (including both security guards and
non-guards) really meant that such unions were
for many purposes entirely outside the scope of
the Act. We conclude that the Board pushed
further than the Act permits when it concluded
that a prohibition against certifying certain
types of unions under the terms of section
9(b)(3), 29 U.S.C. sec. 159(b)(3), also meant
that the unions were otherwise unprotected under
the statute. We therefore set aside the Board's
decision and remand for further proceedings.

  Temple Security provides security services for
various clients, through security guards that it
employs. On September 2, 1986, Temple voluntarily
recognized the General Service Employees Union
(Union) as the representative of all of its

employed guards. Temple and the Union entered into a collective bargaining agreement (CBA), and for several years they maintained a smooth relationship, renewing their CBA every two years. The latest of these CBAs was effective from October 1, 1992, until December 31, 1994. On October 4, 1994, the Union, in keeping with the parties' usual practice, sent Temple a letter indicating that it was ready to begin negotiations for the next two year contract. Temple abruptly and unilaterally informed the Union that it planned to discontinue their relationship at the end of the contract term, December 31, 1994. Nine days later it recognized a new union (the Independent Courier Guards Union, or ICG) as its guards' representative and signed a CBA with this new union on January 31, 1995.

The Union filed charges with the National Labor Relations Board (the Board), claiming that Temple's refusal to bargain and its recognition of a new union violated sections 8(a)(5), (3), (2), and (1) of the National Labor Relations Act (the Act). The Board and the parties agreed to skip the step of going to an Administrative Law Judge, and on May 28, 1999, the Board issued an order against the Union. The key fact, in the Board's view, was that the Union admitted both guards and non-guards to its membership, and hence was a "mixed" union for purposes of section 9(b)(3). That section prohibits the Board from certifying mixed unions as the representative of employees in the bargaining unit, but it says nothing about their status for other purposes under the Act. Nonetheless, the Board reasoned from the prohibition on certification that the Union also had no rights under section 8 that it could enforce, and it rejected all the Union's claims.

We review the Board's decision deferentially. See NLRB v. Transport Service Co., 973 F.2d 562, 566 (7th Cir. 1992). The facts below are not contested; we examine only the Board's legal conclusions to determine whether they are irrational or inconsistent with the Act. See id. Our review is also constrained by the analysis set forth in Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). The Supreme Court recently summarized the approach required by Chevron as follows:

. . . [A] reviewing court must first ask whether Congress has directly spoken to the precise question at issue. If Congress has done so, the inquiry is at an end; the court must give effect to the unambiguously expressed intent of

Congress. But if Congress has not specifically addressed the question, a reviewing court must respect the agency's construction of the statute so long as it is permissible.

FDA v. Brown & Williamson Tobacco Corp., 120 S. Ct. 1291, 1300 (2000) (internal quotations and citations omitted). Brown & Williamson also made clear that the determination of whether Congress has specifically addressed a point is a contextual one, and that "[t]he meaning--or ambiguity--of certain words or phrases may only become evident when placed in context." Id. at 1300-01.

The Court has made it clear in a number of decisions that the NLRB is one of the agencies to which Chevron deference is owed. See, e.g., Holly Farms Corp. v. NLRB, 517 U.S. 392, 398-99 (1996); NLRB v. Town & Country Electric, Inc., 516 U.S. 85, 90 (1995); Lechmere, Inc. v. NLRB, 502 U.S. 527, 536 (1992). Nonetheless, that means the Chevron doctrine in its entirety: both the part that requires a court to defer when ambiguities exist, and the part that requires a court to enforce the plain terms of a statute against the agency when there is no ambiguity. It is in that light, therefore, that we approach the question whether the limitation on certification found in section 9(b)(3) has the broad implications the Board attributed to it.

The Act considers guards "employees." See 29 U.S.C. sec.sec. 152, 159. It grants employees rights to join labor unions and bargain collectively in section 7. See 29 U.S.C. sec. 157. In section 8(a), it limits employer activity in order to protect those section 7 rights: pertinent to our discussion here, section 8(a)(1) prohibits employers from interfering with, restraining, or coercing employees in the exercise of their section 7 rights; section 8(a)(3) forbids employers from discriminating in regard to hiring or any term or condition of employment to encourage or discourage employee membership in a labor union; and section 8(a)(5) prohibits an employer from refusing to bargain collectively with a representative union. See 29 U.S.C. sec.sec. 158(a)(1), (3), and (5).

The duty to bargain and to refrain from instituting unilateral changes in wages and working conditions under section 8(a)(5) normally outlives the parties' CBA. An employer is required to "maintain the status quo after the expiration of a collective bargaining agreement until a new agreement is reached or until the

parties bargain in good faith to impasse." NLRB v. Emsing's Supermarket, 872 F.2d 1279, 1285 (7th Cir. 1989) (internal quotations omitted); see also Peerless Roofing Co. v. NLRB, 641 F.2d 734, 736 (9th Cir. 1981). This rule is designed to promote industrial peace by protecting the stability of long term employer-union relationships. See Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 38 (1987). The enforcement of the status quo ante during renegotiations helps to ensure that the employer will not be able to exercise an unfair advantage by threatening to remove all the concessions for which the union has previously bargained. See Peerless Roofing, 641 F.2d at 736.

The twist here is that, as a mixed-guard union, the Union was not entitled at the outset to be certified as the representative of its employees. Nothing in section 9(b)(3), however, forbids an employer from voluntarily recognizing such a union. (We note as well that section 9(b)(3) looks nothing like section 8(a)(2), 29 U.S.C. sec. 158(a)(2), which absolutely forbids employer-dominated unions. See NLRB v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 251 (1939).) The Board insists that the fact that certification is forbidden has consequences beyond the usual benefits that go along with certification (about which we have more to say below). It reasons that the prohibition found in section 8 against employer unilateral action after a CBA has expired cannot apply to a union whose role in the workplace began with voluntary recognition. Instead, it continues, once the term of a CBA is up, the Act entirely ceases to apply to the parties. One could imagine policy arguments both for and against the Board's position: proponents would argue that there should be a way of ending a voluntary relationship, while opponents would point out that this position runs counter to the Act's policy of attempting to ensure fair and smooth CBA renegotiations in order to promote stable, long term employer-union relationships. In our view, however, the policy arguments are all beside the point (and thus we have no duty to defer to the Board's preferred policy), because the exception proposed by the Board is simply not a part of the Act's plain text.

The Board relies on a Second Circuit decision, Truck Drivers Local Union No. 807 v. NLRB, 755 F.2d 5 (2d Cir. 1985), which upheld Wells Fargo Armored Service Corp., 270 NLRB 787 (1984), to support its position. The Truck Drivers and Wells Fargo argument proceeds as follows: (1) section 9(b)(3) of the Act states that the Board may not

certify a unit represented by a mixed-guard union; (2) the purpose of this prohibition is to prevent potential intra-union conflicts between guards and non-guards; and (3) (here is the imaginative leap) requiring maintenance of the status quo under section 8(b)(5) of the Act after the term of the CBA has expired is analogous to requiring certification of the unit; since the Act prohibits the latter, it must prohibit the former.

The Truck Drivers court, writing before the Supreme Court had elaborated upon the Chevron test, first saw this as a case in which it was obliged to defer to the Board's interpretation of the statute. After acknowledging both the prohibition on certification for mixed unions and the validity of voluntary recognition of such unions, it examined in some detail the legislative history of section 9(b)(3), which it found was directed toward the risk of divided loyalties when a guard is called upon to enforce the employer's rules against a fellow union member. Last, the court thought that it was "reasonable to infer from the statutory language and the decisions under it that the preclusion of certification portends more than merely a simple check on the Board's power to certify the results of an election." 755 F.2d at 9-10. In other words, the court seemed to be saying, it is reasonable to infer that prohibiting certification means something more than prohibiting certification.

With part of this we have no disagreement. Section 9(b) plainly cabins the power of the Board to certify appropriate bargaining units. See 29 U.S.C. sec. 159(b). Section 9(b)(1) prohibits the Board from deciding that a unit including professionals and non-professionals is appropriate unless a majority of the professionals vote for inclusion. See id. Section 9(b)(3) does two things. First, it prohibits the Board from deciding that a unit including guards and non-guards is appropriate. See id. Second, it explains that "no labor organization shall be certified as the representative of employees in a bargaining unit of guards" if that labor organization is a mixed-guard union. Id. (emphasis added). Section 9(b)(3), then, does not prohibit the Board from finding that units made up solely of guards are appropriate. The only limitation on the Board's power vis-a-vis units including guards is that, under 9(b)(3), the Board may not certify unions to represent them if the union also includes non-guards (i.e. it is "mixed").

We do not agree, however, that there is any need to look beyond the language of the Act to understand the scope of the limitation created by section 9(b)(3). See Air Line Pilots Ass'n, Intern. v. United Air Lines, Inc., 802 F.2d 886, 914 (7th Cir. 1986). The Act clearly describes the certification process, and in so doing it provides the kind of context for understanding section 9(b)(3) that the Supreme Court called for in Brown & Williamson. Section 9 lays out a process by which employees, labor organizations, and employers may petition the Board to conduct an election and then to certify the results. See 29 U.S.C. sec. 159. An employer also has a right, under section 9(c), to petition the Board and force a union claiming to represent a majority of employees in an appropriate unit to undergo a Board-certified election. See 29 U.S.C. sec. 159(c); Exxel/ Atmos, Inc. v. NLRB, 28 F.3d 1243, 1246 (D.C. Cir. 1994). Once a unit has been certified by the Board, the representative union is protected from interference with its representation by other unions, the employer, and even dissatisfied employees for a period of one year (a breaking-in period). See 29 U.S.C. sec. 159(c).

This certification process is not the only way for a union to become a representative under the Act. An employer may also extend the Act's coverage to its relationship with a union representing a majority of a group of its employees by voluntarily recognizing the union. See NLRB v. Gissel Packing Co., 395 U.S. 575, 600 (1969); Lincoln Park Zoological Soc. v. NLRB, 116 F.3d 216, 219 (7th Cir. 1997). Importantly, there are differences between a certified union and a voluntarily recognized union. A voluntarily recognized union is not entitled to the special privileges afforded to Board-certified unions: those privileges include the section 9(c)(3) one-year non-rebuttable presumption of majority status; the section 8(b)(4)(C) prohibition against recognitional picketing by rival unions; and the freedom from work assignments disputes restrictions in section 8(b)(4)(D) and from restrictions on recognitional and organizational picketing in section 8(b)(7). See 29 U.S.C. sec.sec. 159, 158; Gissel Packing Co., 395 U.S. at 599 n.14.

On the other hand, voluntarily recognized unions are entitled to the basic protections of the Act: "[c]ertification gives an organization which achieves it additional rights[,] not all its rights." NLRB v. White Superior Division, White Motor Corp., 404 F.2d 1100, 1103 n.5 (6th Cir. 1968). "Section 9(b)(3) is a limitation not upon

employee rights [(such as those found in sections 7 and 8 of the Act)] but upon Board powers." NLRB v. Bel-Air Mart, Inc., 497 F.2d 322, 327 (4th Cir. 1974). Thus, voluntarily recognized unions and the employees represented by them are still protected by 8(a)(5)'s duty to bargain. See Gissel Packing Co., 395 U.S. at 600. The Act does not hinge employees' section 7 rights, or their section 8 protections, on certification; neither section 7 nor section 8 mentions the term. See 29 U.S.C. sec.sec. 157, 158; Bel-Air Mart, 497 F.2d at 327. To qualify for section 7 and section 8 protections, a union must simply be a "representative[ ] of [the] employees." 29 U.S.C. sec. 158(a)(5). Representatives include all of those unions "designated or selected for the purposes of collective bargaining by the majority of the employees in [an appropriate] unit." 29 U.S.C. sec. 159(a).

In keeping with these principles, courts normally apply the Act's protections to voluntarily recognized unions. For example, sections 7, 8(b)(3), and 8(b)(1) have been found to apply to protect guard employees from their employer's attempts to discourage their membership in a mixed-guard union. See White Superior, 404 F.2d at 1103 (refusing to create an exception to section 8(b)(3) for uncertified unions, because Congress did not do so); see also Bel-Air Mart, Inc., 497 F.2d at 327-28. Section 8(a)(5) has also been found to apply whether or not certification has occurred. See NLRB v. Montgomery Ward & Co., 399 F.2d 409, 412-13 (7th Cir. 1968) (finding that a voluntarily recognized union representative, just like a certified representative, must be bargained with, in good faith, for a reasonable time before a decertification petition will be allowed). The Board itself has found that the Act's contract-bar rule applies to uncertifiable mixed-guard union representatives to protect parties to collective bargaining agreements from outside petitions. See Stay Security and United Union of Security Guards, 311 NLRB 252, 252-53 (1993).

We may not attribute more to certification than Congress has chosen to. Creating an exception to section 8(a)(5) protections based on uncertifiability would do just that. The Act specifically limits mixed-guard unions only with respect to Board certification. It attaches particular benefits to certification, and it refrains from conditioning the benefits of sections 7 and 8(a) on certification. This has the effect of establishing a balance between the right of an employer to protect its property, and "the importance of stability in collective

bargaining agreements." Stay Security, 311 NLRB at 252-53. Part of that balance is the Act's determination that its concern for an employer's property rights "is not undermined when the employer voluntarily waives its 9(b)(3) rights and recognizes a guard/nonguard union for a unit of guards." Id. Contrary to the Board's arguments, voluntary recognition does not permanently lock the parties into their relationship. An impasse in good-faith bargaining, or a showing, after a reasonable time, of minority rather than majority support, will both allow an employer to end its pairing with a recognized representative (whether that recognition began voluntarily or through more formal processes). We express no opinion at this juncture on the question whether either of those exceptions--particularly the majority support requirement, given the fact that there is now another union representing these guards--might defeat the Union's claim here. Questions like that are best left to the Board's consideration on remand.

Other courts have accepted the Act's balancing of section 9(b) interests with the general policies of the Act, refusing to create exceptions to section 8(b)(5) based on concerns dealt with elsewhere in the Act. See, e.g., International Tel. & Tel. Corp. v. NLRB, 382 F.2d 366, 369-71 (3d Cir. 1967) (finding that a mixed unit of professional and non-professional employees, though frowned upon within section 9 of the Act, was still protected by section 8(a)(5)'s bargaining requirement). We similarly decline to create an exception to the application of section 8(b)(5) for mixed unions./1

The Union's petition to set aside the decision of the National Labor Relations Board is Granted, and the case is Remanded for consideration of the Union's section 8 claims.

/1 Because our decision disagrees with that of the Second Circuit in Truck Drivers Local Union No. 807 v. NLRB, 755 F.2d 5 (2d Cir. 1985), this opinion has been circulated to all judges in active service under Circuit Rule 40(e). A majority of the judges voted against hearing this case en banc; Judge Ripple voted to hear the case en banc.