## NATIONAL LABOR RELATIONS BOARD v. JONES & LAUGHLIN STEEL CORPORATION.

## SAME v. FEDERAL MOTOR TRUCK CO.

### Nos. 9730, 9769.

Circuit Court of Appeals, Sixth Circuit.

Dec. 8, 1944.

As Amended Feb. 10, 1945.

In No. 9730:

F. J. Donner, of Washington, D. C. (Alvin J. Rockwell, Malcolm F. Halliday, Ida Klaus, and Marcel Mallet-Prevost, all of Washington, D. C., on the brief), for petitioner.

John C. Bane, Jr., of Pittsburgh, Pa. (Reed, Smith, Shaw & McClay and Paul J. Winschel, all of Pittsburgh, Pa., of counsel), for respondent.

In No. 9769:

F. J. Donner, of Washington, D. C. (Alvin J. Rockwell, Malcolm F. Halliday, Frank Donner, and Irene Shriber, all of Washington D. C., on the brief), for petitioner.

Hal H. Smith, of Detroit, Mich. (Albert E. Meder and Beaumont, Smith & Harris, all of Detroit, Mich., on the brief), for respondent.

T. R. Iserman, of New York City (Rathbone, Perry, Kelley & Drye and Nicholas Kelley, all of New York City, on the brief), for Chrysler Corp., amicus curiæ in both cases.

Before HICKS, SIMONS, and ALLEN, Circuit Judges.

HICKS, Circuit Judge.

For these cases one opinion will suffice. No jurisdictional question is involved.

In the Jones & Laughlin case, No. 9730, the petitioner, herein called the Board, seeks the enforcement of an order directing respondent to bargain collectively with United Steel Workers of America (C. I. O.), herein called the Union, as the exclusive representative of all its patrolmen, watchmen, firemen, including "dump laborers," herein called plant protection employees, employed by respondent at its Otis Works, but excluding lieutenants, captains and supervisors. There is included in the membership of this Union, not only plant protection employees, but production employees as well.

In the Federal Motor Truck Company case, No. 9769, the Board seeks the enforcement of an order directing respondent to bargain collectively with Amalgamated Plant Protection Local No. 114, U. A. W. (C. I. O.), herein called the Union, as the exclusive representative of all its plant protection employees at its three Detroit plants, excluding the plant engineer, the assistant chief of plant protection, and all supervisory employees.

The enforcement of the orders is resisted by respondents.

These orders were based upon records made before trial examiners, including re-

sults of elections held by direction of the Board, in which the majority of the plant protection employees, in each case, selected the Unions indicated, as their exclusive representatives for the purpose of collective bargaining with respect to rates of pay, wages, hours and other conditions of employment. In each case the Board affirmed the reports of intermediate examiners to the effect that the employees classified as "plant protection employees" constituted appropriate units for the purpose of collective bargaining within the meaning of Sec. 9(a) and (b) of the National Labor Relations Act, 29 U.S.C.A. § 159(a, b).

■ By subdivision (b) the duty of determining the unit of employees appropriate for the purpose of collective bargaining is placed specifically and exclusively upon the Board. Pittsburgh Plate Glass Co. v. National Labor Relations Board, 313 U.S. 146, 152, 61 S.Ct. 908, 85 L.Ed. 1251. But the Board's authority in making such determination is not an absolute one—it must be exercised within the permissible limits of administrative discretion and whether it did so in these cases is the principal question for review. Marlin-Rockwell Corp. v. National Labor Relations Board, 2 Cir., 116 F.2d 586, 587; National Labor Relations Board v. Delaware-New Jersey Ferry Co., 3 Cir., 128 F.2d 130, 137; National Labor Relations Board v. Botany Worsted Mills, 3 Cir., 133 F.2d 876, 880.

In determining an appropriate unit for collective bargaining, the Board is required by Sec. 9(b) to consider whether its order will insure employees the full benefit of their rights to self-organization and collective bargaining, and this involves the inquiry as to who are "employees," or to be more specific, whether "plant protection employees" are entitled to the benefits of the Act. Here, the Board must give consideration to Sec. 2(2) and (3). Subdivision (3) provides that "the term 'employee' shall include any employee * * *," but subdivision (2) provides that "the term 'employer' includes any person acting in the interest of an employer, directly or indirectly * * *."

Plant protection employees are "employees" when considered in their relationships to their employer (National Labor Relations Board v. Skinner & Kennedy Stationery Co., 8 Cir., 113 F.2d 667, 671) but we find it difficult to determine that they are "employers" when their relationship to their fellow employees is considered. However, under the facts pertaining to their duties as hereinafter set forth, we are unable to say that the Board exceeded the limits of its discretion in determining that plant protection employees are entitled to the protection of the Act. We think that, in determining this question, the Board properly accepted for its guidance the underlying economic facts of the cases in hand. National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 129, 64 S.Ct. 851; National Labor Relations Board v. Blount, 8 Cir., 131 F.2d 585, 590; National Labor Relations Board v. Gluek Brewing Co., 8 Cir., 144 F.2d 847, 855.

The question as to who are employers or employees under the Act is usually presented in cases where some person or agency acting either directly or indirectly for the employer interferes or seeks to interfere with the rights of employees to organize. International Ass'n of Machinists, etc., v. National Labor Relations Board, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed 50; National Labor Relations Board v. Taylor-Colquitt Co., 4 Cir., 140 F.2d 92. That situation is not presented here.

■ Nevertheless the Board could not stop with its finding upon the facts that plant protection employees are entitled to the benefits of collective bargaining. It is required under Sec. 9(b) to go further and determine whether the unit or units selected for that purpose would effectuate "the policies of sections 151–166 of this title. * * *" In both cases respondents concede, as they must concede (Pittsburgh P. Glass Co. v. Board, supra) that the Board had wide discretion in determining whether the units selected were appropriate, and if so, whether their selection effectuated the policies of the Act. But each respondent has insisted from the beginning, and now insists, that in making such determinations the Board went clearly beyond the limits of its discretion. If this is true, the orders are invalid as a matter of law. Pittsburgh Plate Glass Co. v. National Labor Relations Board., 8 Cir., 113 F.2d 698, 701, affirmed 313 U.S. 146, 152, 61 S.Ct. 908, 85 L.Ed. 1251; Midland Steel Products Co. v. National Labor Relations Board, 6 Cir., 113 F.2d 800, 805.

■ We are confronted with a preliminary inquiry into the nature of the policies of the Act. These are set forth in its preamble, Title 29, Sec. 151, U.S.C.A., and we

need not repeat them. It is sufficient to say that the fundamental purposes of the Wagner Act are to eliminate and prevent obstructions to the free flow of interstate commerce (National Labor Relations Board v. Fansteel Corp., 306 U.S. 240, 257, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599) and that in its administration, the Board acts in a public capacity and in the public interest.

In National Licorice Co. v. National Labor Relations Board, 309 U.S. 350, at page 362, 60 S.Ct. 569, at page 576, 84 L.Ed. 799, the court said:

"The proceeding authorized to be taken by the Board under the National Labor Relations Act is not for the adjudication of private rights. Amalgamated Utility Workers v. Consolidated Edison Co. [ante], 309 U.S. 261, 60 S.Ct. 561, 84 L.Ed. 738, H. Rept. No. 1147, 74th Cong., 1st Sess., Committee on Labor, p. 24; cf. Federal Trade Commission v. Klesner, 280 U.S. 19, 50 S.Ct. 1, 74 L.Ed 138, 68 A.L.R. 838. It has few of the indicia of a private litigation and makes no requirement for the presence in it of any private party other than the employer charged with an unfair labor, practice. The Board acts in a public capacity to give effect to the declared public policy of the Act to eliminate and prevent obstructions to interstate commerce by encouraging collective bargaining * * *."

In Amalgamated Workers v. Consolidated Edison Co., 309 U.S. 261, at page 265, 60 S.Ct. 561, at page 563, 84 L.Ed. 738, the court said:

"The Board as a public agency acting in the public interest, not any private person or group, not any employee or group of employees, is chosen as the instrument to assure protection from the described unfair conduct in order to remove obstructions to interstate commerce."

In National Labor Relations Board v. Hearst Publications, supra, 322 U.S. 111, page 123, 64 S.Ct. 851, 857, the court said:

"The Wagner Act is federal legislation, administered by a national agency, intended to solve a national problem on a national scale."

In National Labor Relations Board v. Colten, 105 F.2d 179, 182, we said:

"This contention, however, ignores the essential nature of regulatory statutes of the class here considered, and the scope and purpose of administrative orders made in exercise of powers conferred by such legislation. They are to implement a public social or economic policy not primarily concerned with private rights, and through remedies not only unknown to the common law but often in derogation of it."

This statement was in substance repeated in Consumers Power Co. v. National Labor Relations Board, 6 Cir., 113 F.2d 38, 44.

In selecting appropriate units for collective bargaining, the duty of the Board to consider the public interest as a material factor is not different from that imposed upon it in the administration of any other feature of the Act. It must consider the public interest and may not delegate its authority in this respect. See Marshall Field & Co. v. National Labor Relations Board., 7 Cir., 135 F.2d 391, 393. To assist it in arriving at a conclusion, it may, under Sec. 9(c) of the Act, 29 U.S.C.A. § 159(c), take a secret ballot of employees, but it is not compelled to do so. Marlin-Rockwell Corp. v. National Labor Relations Board, supra, 116 F.2d at page 587. In case an election is held, the Board should consider the will of the majority of the employees, but the result of the election does not altogether conclude the matter. In National Labor Relations Board v. Delaware-New Jersey F. Co., supra, 128 F.2d at page 137, the court said:

"But the point here is not what the officers want, nor what the men want, nor what the company either wants or is willing to acquiesce in, but rather, what is the public interest."

This statement had approval in Glen Alden Coal Co. v. National Labor Relations Board, 3 Cir., 141 F.2d 47, 50.

We think that in each order under review the Board failed to give adequate consideration to the national welfare and this is a fundamental error. In adopting the conclusions of the trial examiners that the Unions selected by a majority of the plant protection employees were appropriate, the Board failed to give effect to the fact that from December 11, 1941, the country was at war, a fact which we judicially know, and it failed to consider the further unquestioned fact that each respondent was engaged in the production of war material and other necessities for the armed forces and the national war effort.

We proceed to consider the undisputed facts in each case.

In the Jones & Laughlin case, No. 9730, the respondent on June 30, 1942, acquired and began to operate two steel plants in

722

Cleveland, known as the "Otis Works." In that year it produced in these plants one million tons of its products. It employed approximately 4700 men and women in its mills and buildings; to protect its investments in these plants and to keep peace and preserve order among it employees, it maintained a force of uniformed plant guards, consisting of a captain, eight lieutenants, fifty-eight patrolmen, two fire captains, two firemen and two "dump laborers" who performed plant protection work. It was the duty of the guards to keep out intruders; to see that the rules and regulations of respondent were observed within the plant for the benefit of all concerned, and to act as conservators of the legal rights of respondent. They had the additional responsibility of carrying out the orders of the management, often of a confidential nature. The duties of the fire captains and firemen are indicated by their titles.

In the Federal Motor Truck Co. case, No. 9769, the respondent in 1942 operated three plants in Detroit in the exclusive production of motor trucks, bodies, cabs and parts for use in the war effort. In that year it delivered finished products to points outside of Michigan of the approximate value of $25,000,000. It had about 660 production employees and about 18 plant protection employees. The duties of these employees were substantially similar to the guards or watchmen in the Jones & Laughlin plants. It was their duty to identify all workmen, trucks and cars that entered or left the plant; to examine the parcels and lunch boxes of the employees; to escort railroad cars into the yards; to make recommendations as to the discharge of employees and to make arrests, without warrants, for violation of the Sabotage and Espionage Acts, 50 U.S.C.A. §§ 101–106, 31–42.

In common with similar watchmen or guards employed in the Jones & Laughlin plants, they carried arms, wore uniforms, were organized into companies and were militarized. They were styled Auxiliary Military Police and were commanded, drilled and instructed as such. They were required to enter into an agreement with the United States that they would well and faithfully discharge their duties in the protection of war materials and utilities, and would obey any orders in connection therewith issued by the President as Commander-in Chief, or his duly authorized officers, and would be governed by the Articles of War 10 U.S.C.A. § 1471 et seq., and would sub-ject themselves to military law. They were required to take the usual oath incident to induction into the Army.

Upon the other hand, when they were inducted into the Unions and became subject to their orders, rules and decisions, the plant protection employees assumed obligations to the Unions and their fellow workers, which might well in given circumstances bring them in conflict with their obligation to their employers, and with their paramount duty as militarized police of the United States Government.

The national welfare is of supreme importance and especially is this true in time of war. The evidence reflects the deep concern of the Government for the maintenance and protection of respondents' plants and for the integrity and volume of their products.

If these matters were given consideration by the Board it was nowhere reflected in any of its orders or decisions. It contented itself with the adoption of the reports of trial examiners that the units selected were appropriate for the purposes of collective bargaining with respect to rates of pay, wages, hours and other conditions of employment. It nowhere finds that the bargaining units were selected in deference to the imperative public interests. Assuming that the units selected would in their negotiations have due regard for the national welfare, such an assumption would not satisfy the statute.

The Board, under Sec. 9(b) had a positive duty to perform in the interest of the public. It must be kept in mind that in time of national peril, the preservation, protection and promotion of the national welfare is the paramount objective; and the Board must select bargaining agents with this in view. It must anticipate that the Union selected as agent would negotiate through individual members who had a common interest with the employees in securing for themselves advantageous agreements with respect to hours, wages and other conditions of employment. It is manifest that these personal interests of the bargainors, as well as the demands made upon them either by the employees or employers might necessarily constitute a serious and embarrassing handicap when it came to the consideration of the interest of the public. When these particular Unions were selected as bargaining agents for the plant protection employees, these employees might in an effort to discharge their duty to their em-

ployer find themselves in conflict with other members of their Union over the enforcement of some rule or regulation they were hired to enforce; or upon the other hand, in conflict with the Federal Government because of fealty to the Union at the time of a dispute involving the public interest. We think that the imposition of such strains upon personal allegiance and personal interest would undoubtedly be detrimental to the public interest and to the free flow of commerce.

Confining ourselves to the facts of these particular cases, we conclude for the reasons indicated, that the applications to enforce the orders under review should be, and they are, therefore denied.