**Wilfredo COLON VELEZ, et al., Plaintiffs,**

v.

**PUERTO RICO MARINE MANAGEMENT, INC., and Asociacion Internacional De Estibadores and/or International Longshoremen's Association, Local 1575 AFL–CIO, Defendants.**

Civ. No. 86–1272(JP).

United States District Court,
D. Puerto Rico.

July 19, 1988.

Ana Rosa Biascoechea, Hato Rey, Puerto Rico, for plaintiffs.

Rafael Medina Zerpa, Hato Rey, Puerto Rico, for codefendant Puerto Rico Marine Management.

Nicolás Delgado Figueroa, Santurce, Puerto Rico, for codefendant Int'l Longshoremen's Assoc.

OPINION AND ORDER

PIERAS, District Judge.

This is a case under § 301 of the Labor Management Relations Act of 1947, 29 U.S.

C. § 185, and is before this Court on the parties' cross motions for summary judgment on the question of liability. Twenty-nine named plaintiffs were discharged from their positions as gatemen/guards ("*porteros*") when defendant Puerto Rico Marine Management, Inc. (PRMMI) eliminated their positions and replaced them with guards provided by the Wackenhut Corporation on a subcontract.

The plaintiffs claim that PRMMI breached the collective bargaining agreement when it contracted for guard services and discharged the plaintiffs without submitting the issue to bargaining, and that Local 1575 of the International Longshoreman's Association breached its duty of fair representation when it failed to press the plaintiffs' grievances. Each plaintiff claims $115,000.00 in damages and asks the Court for reinstatement with back pay and seniority.

## I. *Findings of Fact*

In addition to the facts stipulated at the Initial Scheduling Conference, *see* unpublished Order of October 26, 1987,[1] the Court considers the following facts to be undisputed:

PRMMI began operating in Puerto Rico in 1974. (Defendant PRMMI's Statement of Material Facts, p. 1) At the time, PRMMI voluntarily recognized ILA Local 1575 as representative both for the production and maintenance workers and for the guards, as members of one bargaining unit, at the Lo–Lo facilities in San Juan. In addition, PRMMI employed guards who were not affiliated with ILA at the Isla Grande facilities, and it subcontracted guard services to Wackenhut at both the Mayaguez and Ponce facilities. (Defendant PRMMI's Statement of Material Facts, p. 1). When negotiating a master contract with ILA in 1977, PRMMI proposed the elimination of those *porteros* who did guard-type work from the bargaining unit. (Defendant PRMMI's Statement of Material Facts, p. 1, 2). This proposal was ultimately withdrawn, and the *porteros* at the Ro–Ro facilities in San Juan were added to the collective bargaining agreement. (Defendant PRMMI's Statement of Material Facts, p. 2; Plaintiffs' Statement of Material Facts, p. 3). In March 1979, Local 1575 demanded that all guard services be included in the bargaining unit, including those at the Ponce facility, and PRMMI acquiesced. (Defendant PRMMI's Statement of Material Facts, p. 2).

PRMMI proposed eliminating the guards from the bargaining unit in negotiations over the 1980–83 and 1983–86 collective

1. The facts stipulated are as follows:

A. Each and every one of the plaintiffs was an employee of Puerto Rico Marine Management, Inc.'s and a member of the International Longshoremen's Association, Local 1575. Plaintiffs were "employees" within the meaning of section 2 of the Taft–Hartley Act, 29 U.S.C. § 152(3) (1982).

B. Defendant company is, and was at all times relevant to this case, an "employer" within the meaning of sections 2(2), 501(1) and 501(3) of the Taft–Hartley Act, 29 U.S.C. §§ 152(2), 142(1), 142(3) (1982).

C. Defendant Union is, and was at all times relevant to this case, a labor organization within the meaning of sections 2(5), 501(1) and 501(3) of the Taft–Hartley Act, 29 U.S.C. §§ 152(5), 142(1), 142(3) (1982).

D. Between August 8, 1985, and September 30, 1986, there was a collective bargaining agreement between defendant employer and union. This collective bargaining agreement contained a "just and reasonable cause" standard for discipline, suspension, or discharge of employees. The collective bargaining agreement also described a seniority system.

Finally, a grievance procedure that culminated in binding arbitration was established by the collective bargaining agreement. The scope of the grievance procedure included "any incident, dispute, claim or controversy" between the signators over the interpretation and implementation of the collective bargaining agreement.

E. On or about February 11, 1986, plaintiffs each received a letter from defendant employer discharging them, effective February 12, 1986. Defendant employer subsequently subcontracted with another company to perform security guard duties on the employer's premises.

F. On May 23, 1986, defendant union filed an unfair labor practice charge with the National Labor Relations Board (NLRB). The charge alleges that the employer refuses to bargain over the terms and conditions of employment of the union's members as relates to the discharge of plaintiffs and the subcontracting of security guard work. The charge, 24–CA–5378 (filed May 23, 1986), is pending before the NLRB.

bargaining agreements. (Defendant PRMMI's Statement of Material Facts, p. 2, 3). PRMMI made the proposal once again in 1985, citing rising insurance costs due to inadequate security services which resulted in stolen property and vandalism. (Defendant PRMMI's Statement of Material Facts, p. 3). This proposal was rejected by the ILA. (Defendant PRMMI's Statement of Material Facts, p. 3).

Thus Local 1575 began its representation of PRMMI *porteros* in 1974, and by 1979 it was the representative of all the *porteros*. The *porteros* paid union dues and received the full benefits of representation, including grievance processing. (Plaintiff's Exhibit, Juan Vélez Rodríguez affidavit, p. 1, 2). The relationship of the *porteros* to Local 1575 did not change until February 12, 1986, when the *porteros* were discharged. Throughout the period, both PRMMI and Local 1575 were aware that the *porteros* performed both gatemen-type work and guard-type work, and that guard-type work predominated. The *porteros* were all guards within the meaning of the National Labor Relations Act. (Unpublished Settlement Conference Order of this Court, January 16, 1987).

During a seven-day national strike by the ILA in October, 1984, PRMMI hired additional security personnel, but the *porteros* did not participate in the strike. (Plaintiff's Exhibit, Luis Colón Ramos affidavit, p. 2).

In February 1985, the vice-president of security for PRMMI was instructed to solicit bids from private security firms for the subcontracting of guard services. (Casaine affidavit, p. 2).

On June 25, 1985, Local 1575 filed a complaint in this Court, requesting an injunction against a rumored subcontracting of guard services. In an attempt to settle this disagreement, PRMMI and Local 1575 entered into a stipulation in August 1985, which defined the exact duties of "gatemen". (Colón affidavit, p. 1, 2). In the stipulation, the parties agreed that the responsibilities of gatemen were "to check the number of trailers and vans that leave the premises to ensure they are correct

according to a card, or to receive from the driver a pass, check the bills of lading, check the entrance and exit of cars."

In December 1985, the company approved the selection of Wackenhut as security services subcontractor (Ryan affidavit, p. 1, 2). The contract between PRMMI and Wackenhut was executed on December 13, 1985, with services to begin on February 3, 1986. (Carreras affidavit, p. 1).

Local 1575 became aware of the subcontracting plans in early 1986, and at that time PRMMI indicated to Local 1575 that it would honor all obligations under the collective bargaining agreement with respect to gatemen. (Carreras affidavit, p. 1). In response, the union counseled the *porteros* to form a new union exclusively comprising guards. Mr. Francisco Saurí filed a petition with the National Labor Relations Board seeking representation by *Union de Guardianes Independientes*. (Plaintiff's Exhibit, Juan Vélez Rodríguez affidavit, p. 4). The case was ultimately dismissed as moot after the plaintiffs were discharged. (Plaintiff's Statement of Material Facts, ¶ 47).

On February 12, 1986, PRMMI discharged 62 of 65 *porteros*. (Plaintiff's Statement of Material Facts, ¶ 45). The collective bargaining agreement between PRMMI and Local 1575 was to expire on September 30, 1986. (Plaintiff's Statement of Material Facts, ¶ 16).

The Wackenhut guards were substituted for the *porteros* and subsequently performed substantially the same work. (Plaintiff's Amendment to Statement of Material Facts, p. 2). The cost to PRMMI of Wackenhut guards was $6.20 per hour. (Plaintiff's Statement of Material Facts, ¶ 34). The cost to PRMMI of the Local 1575 *porteros* was over $16.00 per hour.

On May 23, 1986, Local 1575 filed an unfair-labor-practice charge against PRMMI, alleging violations of §§ 8(a)(1) and 8(a)(5) of the NLRA in the unilateral subcontracting of the *porteros*, in NLRB Case No. 24–CA–5378. (Plaintiff's Statement of Material Facts, ¶ 67). The NLRB refused to issue a complaint in this case because the union had failed timely to re-

quest bargaining over the decision. (Plaintiff's Exhibit I, #2—October 10, 1986, Memorandum of Harold J. Datz). In April and June, 1986, Local 1575 requested job preference for the *porteros* in other unit classifications. Although PRMMI agreed to consider this request, the agreement was never formalized or implemented. (Plaintiff's Statement of Material Facts, ¶ 62).

## II. *The Standard for Summary Judgment*

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Arriaga v. I.L.G.W.U.–Puerto Rico Council*, 656 F.Supp. 309 (D. Puerto Rico 1987). Pursuant to Local Rule 311.12, the parties have submitted statements of material facts, sworn statements, and supporting documents. Most of the facts are undisputed, and those few that are controverted are immaterial to the issues before the Court. Thus the only questions for the Court are legal ones, and the matter is ripe for resolution by summary judgment.

## III. *Matters of Law*

In hybrid § 301 cases, *i.e.*, cases in which the employees assert breach of contract by the employer as well as breach of duty of fair representation by the union, the plaintiffs have the burden of showing (1) that the discharge was contrary to the contract, and (2) that the union breached its duty. *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976).

## A. *Breach of Contract*

The breach of contract question is at first blush relatively straightforward. Article VI, Clause 38, clearly requires bargaining over subcontracting:

> The Company will not subcontract any work covered by the Contract, unless it is negotiated by the parties and the subcontractor obliges himself to honor the contract subscribed by the Company; and the Company will guarantee the payments that the subcontractor will be obliged to make to the Welfare Fund.

The Wackenhut subcontract and the consequent discharge of the sixty-two *porteros* was clearly not negotiated and thus violated the collective bargaining agreement.[2]

The defendants argue that there was no duty to bargain over subcontracting of guard services because the *porteros* were not parties to the collective bargaining agreement.[3] The defendants base their argument on § 9(b)(3) of the National Labor Relations Act:

> (b) The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof: *Provided*, that the Board shall not ... (3) decide that any unit is appropriate for such purposes if it includes, together with other employees, any individual employed as a guard to enforce against employees and other persons rules to protect property of the employer or to protect the safety of persons on the employer's premises; but no labor organization shall be certified as the representative of employees in a bargaining

---

**2.** PRMMI's statutory duty to bargain over subcontracting under § 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5), is not before the Court. Local 1575 grounded NLRB Case No. 24–CA–5378 on PRMMI's § 8(a)(5) duties; but this case was dismissed by the NLRB because Local 1575 had waived its rights by failing to request bargaining. In this § 301 case, waiver of rights is not a factor in determining PRMMI's duty to bargain, nor are the other factors that the Board normally considers,

see *Westinghouse Electric Corp. (Mansfield Plant)*, 150 N.L.R.B. 574 (1965), including PRMMI's motivations for subcontracting—economic or otherwise. *Cf. Fibreboard Paper Products Corp. v. N.L.R.B.*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964); *Otis Elevator Co.*, 269 NLRB 891 (1984).

**3.** Thus the work done by the *porteros* was not "work covered by the contract."

unit of guards if such organization admits to membership, or is affiliated directly or indirectly with an organization which admits to membership, employees other than guards.

29 U.S.C. § 159(b)(3). The defendants argue that this section makes production/maintenance units that also include guards inappropriate for all purposes.[4] Local 1575 and PRMMI were therefore not compelled to bargain over the elimination of *portero* jobs through subcontracting. Moreover, the argument continues, Local 1575 was prohibited from representing the interests of the *porteros* to PRMMI. The collective bargaining agreement was not therefore offended when the plaintiffs, not properly part of the bargaining unit, were discharged.

The parties have agreed that the plaintiffs, twenty-eight of the sixty-two *porteros*, were guards within the meaning of § 9(b)(3). *See* unpublished Settlement Conference Order of January 16, 1987. They have also agreed that Local 1575 represented both the guards and the production and maintenance workers at each PRMMI facility as bona fide members of the Union. *Id.* The narrow legal question for this Court, then, is whether § 9(b)(3) voids the provisions of the collective bargaining agreement with respect to the *porteros* because the *porteros* could not legally affiliate with the other ILA members.

The rights of guards under federal labor law have varied with varying interpretations of the scope of § 9(b)(3) by courts and the NLRB. The provision was intended by Congress to inhibit the conflict of interest that inheres when guards belong to the same union as striking employees. Congress drafted the section specifically to counter the Supreme Court decision in *NLRB v. Jones & Laughlin Steel Corp.*, 331 U.S. 416, 418, 67 S.Ct. 1274, 91 L.Ed. 1575 (1947).

In that case, *Jones & Laughlin*, the Sixth Circuit had reversed the NLRB's or-

der directing the company to bargain with a union that included both plant-protection employees and production employees, holding that such unions were contrary to the public welfare. *NLRB v. Jones & Laughlin St. Corp.*, 146 F.2d 718 (6th Cir.1945). The circuit court reasoned that the guards "might in an effort to discharge their duty to their employer find themselves in conflict with other members of their Union over the enforcement of some rule or regulation they were hired to enforce.... We think that the imposition of such strains upon personal allegiance and personal interest would undoubtedly be detrimental to the public interest and to the free flow of commerce." *Jones & Laughlin St. Corp.*, 146 F.2d at 722, 723.

The Supreme Court reversed, finding as reasonable the Board's policy of certifying unions comprising both production/maintenance employees and guards when the guards were placed in a separate bargaining unit. *Jones & Laughlin*, 331 U.S. at 418, 67 S.Ct. at 1276. Congress responded, being persuaded by the reasoning of the circuit court, by codifying in § 9(b)(3) the policy against both unions and units that include both guards and production/maintenance employees. *Truck Drivers Local Union No. 807 v. N.L.R.B.*, 755 F.2d 5 (2nd Cir.1985), *citing* 93 Cong.Rec. 6444, *reprinted in* II N.L.R.B., Legislative History of the Labor Management Relations Act, 1947 (1948); *NLRB v. American Dist. Tel. Co.*, 205 F.2d 86, 89–90 (3d Cir.1953). *See also NLRB v. Bel–Air Mart, Inc.*, 497 F.2d 322 (4th Cir.1974).

By its terms, § 9(b) applies only to the NLRB, restricting the Board from using its processes to support a mixed unit. *Erie County Geriatric Center v. Local No. 2666*, 464 F.Supp. 561 (W.D.Pa.1978) *aff'd without opinion*, 622 F.2d 578 (3d Cir. 1980). *Cf. N.L.R.B. v. White Superior Division*, 404 F.2d 1100, 1103 (6th Cir.1968). The NLRB's interpretation of the statute's restriction has expanded over the years. Although the Board at one time lent limited

---

**4.** The parties and most cases use the term "mixed-guard unit" to describe the unit at issue here. This Court will avoid this shorthand and describe the unit according to its actual compo-

sition: Local 1575 is predominantly a production/maintenance unit which includes some guards as members.

support to mixed units, *see Wallace–Murray Corp.*, 192 NLRB 1090 (1971), it now construes § 9(b)(3) so broadly as to prevent Board certification of the arithmetic results of an election, *University of Chicago*, 272 NLRB No. 126 (1984), and clarification of a guard unit in a general union. *Brinks Inc. and Security Leasing Co.*, 272 NLRB No. 125 (1984). *See also Truck Drivers Local Union No. 807*, 755 F.2d 5. Thus when balancing the interests of the employees in free choice of a representative against the public interest in separate bargaining units for guards, the Board has increasingly given priority to the public interest by restricting its own actions in support of production/maintenance units that include guards. No court or agency, however, has stripped guards of rights to the extent that the defendant asks us so to do.

In a closely analogous case, the district court of the Western District of Pennsylvania held that § 9(b)(3) did not prevent a unit comprising guards and production/maintenance employees from bargaining with a consenting employer and that the members of such a unit were entitled to the bargained-for benefits in the collective bargaining agreement. *Erie County Geriatric Center*, 464 F.Supp. 561. The guards in *Erie County* were found to be parties to the collective bargaining agreement on the basis of several facts: the company treated the guards as union members; the initial contract explicitly included guards; the guards voted in elections; and a guard was once president of the union. These facts showed that the guards were in fact members of the unit, despite a certification to the contrary by the Pennsylvania Labor Relations Board. The court explicitly rejected arguments by the employer that § 9(b)(3) made the affiliation unlawful and that the collective bargaining contract was void ab initio.

▮▮▮ This Court likewise construes § 9(b)(3) as limitation only upon the NLRB, although presumedly a broad limitation

that prohibits any act by the Board in support of a unit comprising both guards and production/maintenance employees.[5] The statute does not operate to remove rights from guards who join mixed units. Therefore, if the plaintiffs in this case joined Local 1575, which was voluntarily recognized by PRMMI as the representative of the *porteros* as well as the production and maintenance employees, then the plaintiffs obtained full employee rights under the National Labor Relations Act. *Cf. Bel–Air Mart, Inc.*, 497 F.2d at 327, *quoting Rock–Hill–Uris, Inc. v. McLeod*, 236 F.Supp. 395 (S.D.N.Y.1964) (both in the context of general unions containing guards).

The facts clearly show that the plaintiffs were members of Local 1575, the representative recognized by PRMMI. The contracts explicitly included *porteros*, the job classification of all the gatemen and gateman/guards. The plaintiffs paid union dues and were represented by the union in grievances. Both PRMMI and Local 1575 were aware that the *porteros* were guards under § 9(b)(3) and that all *porteros* were members of the union. In fact, the issue of including *porteros* in the bargaining unit was the object of continual contention from 1974 to 1986. Local 1575 demanded that it represent all *porteros*, and PRMMI voluntarily complied by recognizing the mixed unit.

The defendant PRMMI now complains that its recognition of the bargaining unit was not voluntary, in the sense that PRMMI agreed to it only under threat of a strike. However, the company's motivations for recognizing the unit are completely irrelevant. The Court considers recognition of the bargaining unit to be as voluntary as any other concession by PRMMI, including the union-shop clause, the work-guarantee provision, and the grievance procedures. *See Rock–Hill–Uris, Inc.*, 236 F.Supp. at 397.

---

**5.** The treatment by courts of § 9(b)(3)'s limitations on mixed-guard union is also informative. The Second Circuit has held that § 9(b)(3) does not make it unlawful for guards to join unions that contain other types of employees. *White*

*Superior Division*, 404 F.2d at 1103. And the Fourth Circuit has concluded that § 9(b)(3) does not proscribe a general union from representing guards. *Bel–Air Mart, Inc.*, 497 F.2d at 327.

The defendants contend that even if the *porteros* were members of the bargaining unit at the beginning of the collective bargaining term, the stipulation entered into by PRMMI and Local 1575 in Civil Case No. 85–1380, removed *porteros* who were actually guards. In relevant part, the stipulation of August 23, 1985, reads as follows:

2. The parties herein agree that the duties and responsibilities of the "gatemen" are:

(a) to check the number of the trailers vans that leave the premises to ensure they are correct according to a card, or to receive from the driver a pass, check the bills of lading, check the entrance and exit of cars.

3. PRMMI represents that there does not exist, to date, any agreement with any other company to provide those services which are provided by the "gatemen", as set forth above in paragraph 2.

4. PRMMI represents that it will not take any action with the classification of "gatemen" without communicating before hand with Local 1575, and will comply with all obligations, if any, under law or the extant collective bargaining agreement.

The stipulation is signed by Nicolás Delgado Figueroa, the attorney for Local 1575, and Rafael Medina Zerpa, the attorney for PRMMI.

In the opinion of the defendants, this stipulation allowed PRMMI to segregate guard positions from true gatemen positions, to assign the most senior *porteros* to gatemen positions, and to lay off the remainder of the *porteros* in order to award a subcontract to Wackenhut. The Court considers the defendants' analysis to be deficient in two respects.

First, the Court is unaware of any legal authority for the principle that an employer and a union are permitted to reach an agreement excluding bona fide minority members from the bargaining unit during the term of the collective bargaining agreement. Such a policy would not only deprive the employees of the benefit of the bargain that they reached, but it would leave them without fair representation by the union. Neither of these results is acceptable, and in fact, both are prohibited: Section 301 requires this Court to enforce the collective bargaining agreement against the company, and § 8(a) of the National Labor Relations Act requires the union fairly to represent the employees.

Second, there is no evidence in the record indicating that the de facto inclusion of the plaintiffs in the bargaining unit ended upon entry of the stipulation. The *porteros,* both gatemen and guards, remained working for PRMMI and continued membership with Local 1575 until the date they were laid off, February 12, 1986. The stipulation therefore had no effect upon the obligation of the parties in this case.

The Court concludes that the *porteros* were bona fide members of Local 1575 at the time of the dismissal; that PRMMI voluntarily recognized Local 1575 as representative of the plaintiffs, with full knowledge that Local 1575 included guards; and that nothing in federal law prohibited this relationship, apart from § 9(b)(3)'s restrictions on the Board. These conclusions are determined by the facts and the law, although our course was unsteadied by certain ill winds: of lack of character, and of infidelity to principle. Clearly, the reason that the law discourages amalgamating guards and production/maintenance employees is to avoid the temptation toward collusive behavior arising from the bonds of union brotherhood. In this case, the legislator would certainly aim to avoid any relaxation of the guards' duties to detect pilferage at the waterfront warehouse and to bring charges against the criminals— even if they are fellow union members. To prevent such criminal acts and to protect the free flow of commerce, Congress chose to forbid maintenance/production units from recourse to the NLRB if they included guards as members.

The unions, as defenders of the rights of the employees, as beneficiaries of the legislation, and as promulgators of moral standards among their members, should be the first to refuse any suggestion that guards be included in the same unit with production/maintenance employees. And they

should retain this position in spite of the pressures that might come to bear upon the union officials and negotiators. Likewise an employer should give no countenance to the notion that avoiding a strike and signing an agreement constitute sufficient reason for agreeing to a contract that violates the spirit of the law and that will cause the economic collapse of the business in the long run.

Had the parties followed these responsibilities, the Court would have had no reason so finely to parse the language of § 9(b)(3) with regard to a grayer area of the statute. We have nevertheless done so and find that the plaintiffs are entitled to the full benefits of the collective bargaining agreement, including the prohibition of subcontracting. PRMMI therefore breached the collective bargaining agreement when it dismissed the plaintiffs on February 12, 1986, and the company is liable for the damages caused by its breach.

### B. *Duty of Fair Representation*

■ A union violates its duty of fair representation in administering a collective bargaining agreement when its actions are arbitrary, discriminatory, or in bad faith. *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967). In the First Circuit, a trial court is instructed not merely to check the alignment of the union's challenged conduct against a static test or standard. Rather, the court's task is to "look behind the standard to what is really at issue." *Berrigan v. Greyhound Lines, Inc.*, 782 F.2d 295 (1st Cir.1986). That is, the union members are "entitled to representation not debilitated by hostility; to a bargaining agent in possession of all relevant facts and arguments; and to real, as opposed to perfunctory, efforts to protect their welfare. But they could not insist that their agent ignore the legitimate interests of all other members." *Berrigan*, 782 F.2d at 298. In the present case, the real issue is whether the Union actually attempted to protect the welfare of the plaintiffs.

■ The plaintiff's contend that Local 1575 should have taken their discharge grievances through all the steps of the grievance arbitration process; that Local 1575 should have sought redress for the discharges and the subcontracting; and that Local 1575 should timely have requested bargaining over the subcontract. The defendant Local 1575 claims, of course, that it did everything it could legally have done on behalf of the plaintiffs, including filing Civil Case No. 85–1380 to prevent subcontracting, participating in NLRB Case 24–RC–7045, and asking for hiring preferences for laid-off guards.

For the most part, the Union virtually admits plaintiffs' allegations and rests its case on its legal inability to represent the guards. In other words, Local 1575 does not claim to have exhausted the grievance process on behalf of the plaintiffs; nor does it claim to have made a good-faith judgment that the discharged workers lacked a colorable grievance; nor does it argue that it in fact requested bargaining over the Wackenhut subcontract. Instead, Local 1575 claims that it could take no actions on behalf of its member guards after August 23, 1986, the date it entered into the stipulation quoted above. The union's defense to duty-of-fair-representation charge is, then, purely legal; and it is identical to the defense raised by PRMMI, above.

Following the analysis above, the Court is therefore compelled to conclude that the defendant Union violated its duty of fair representation. The record supports the plaintiffs' claim that the Union took virtually no action with respect to the discharges of the plaintiffs or to the subsequent subcontracting. The Union's only effort on behalf of the plaintiffs began on May 23, 1986, when it filed NLRB Case No. 24–CA–5375, challenging the Wackenhut subcontract under § 8(a)(5). This case was withdrawn after an NLRB report recommended dismissal. The general counsel's office noted:

The Union heard rumors in May 1985 and January 1986 that gatemen work might be subcontracted. The Union reacted promptly to these rumors, first by seek-

ing to enjoin the subcontracting and later by encouraging the gatemen to secure representation by a union which did not run afoul of Section 9(b)(3). However, when the Union learned on January 28 that the Employer would definitely subcontract the gatemen work, it took absolutely no action. Even when the Union heard in early February that the subcontract would take effect on February 12, and that the contract was voidable on 24 hours notice, it failed to request bargaining. In analogous circumstances, where unions were afforded 4 and one half or 8 days notice of impending layoffs, but failed to request bargaining, they were found to have waived their right to bargain over these decisions.

Plaintiff's Identification # 26, p. 6 (footnote omitted).

Thus the only action taken by Local 1575 in the interests of the plaintiffs was so untimely as to be meritless. The NLRB report concluded that "the Union failed to diligently pursue its bargaining rights by timely requesting bargaining." Plaintiff's Identification # 26, at 7. The Court concludes that the filing of NLRB Case No. 24–CA–5375 was at best a perfunctory effort to advance the interests of the guards.

In addition, the Court concludes that the Union took no other action in the interests of the plaintiffs. The filing of Civil Case No. 85–1380 was directed only to the benefit of the three *porteros* who were not affected by the subcontracting, and it resulted in the abandonment of the plaintiffs, not in representation. The participation (intervention) in NLRB Case 24–RC–7045 was likewise only in defense of the interests of the remaining members of Local 1575, not of the plaintiffs. Finally, the Union's request for rehiring preferences is obviously a perfunctory and mechanical response to the complaints of the plaintiff, and it falls far short of representing the legitimate interests of the *porteros.*

In conclusion, the Court holds that the actions taken by Local 1575 to protect the welfare of the plaintiffs were so careless and perfunctory that they violated the Union's statutory duty of fair representation.

## IV. *Damages*

Under *Vaca v. Sipes* and *Bowen v. United States Postal Service,* 459 U.S. 212, 103 S.Ct. 588, 74 L.Ed.2d 402 (1983), the plaintiffs' right to be made whole dictates that the Court apportion damages according to the fault of PRMMI and Local 1575. When the Union's breach of duty arises from its failure to pursue an employee's grievance, the Court is justified in holding the company liable for damages from the time of discharge until the date on which it would have reinstated the plaintiffs if the Union had fulfilled its duty. All damages accruing after the hypothetical reinstatement date are to be paid by the Union.

Article XV of the Collective Bargaining Agreement describes the grievance process:

B. COMPLAINTS AND GRIEVANCES: Any incident, dispute, claim or controversy which may arise between the parties under the terms of this Agreement that may not be settled within forty-eight (48) hours (Saturdays and Sundays excluded) through direct negotiations between a representative of the Company and a representative of the Union, will be submitted in writing by the interested party to the other party not later than ten (10) days from the date the incident, dispute, claim or controversy occurred. The party submitting the dispute in writing shall clearly set forth the nature of the grievance and shall name a Representative with whom the other party shall discuss the complaint. The party receiving the written complaint shall immediately appoint a representative who shall meet with the other party's representative and discuss the matter in an attempt to settle same. If no satisfactory settlement is reached within five (5) days from the date of the first meeting, the complaint must be submitted in writing to arbitration, with the exception of claims for wages and interpretation of the Law where the claimant may go to Court.

C. ARBITRATION: Any dispute that cannot be settled through the complaint and grievance procedure, and any dispute with respect to the interpretation or alleged violation of any provision of this Agreement shall be submitted in writing to arbitration. The Arbitration Committee will be constituted by two Representatives of the Company and two Representatives of the Union and a fifth member appointed by Secretary of Labor or the person designated by him. The appointment of the representatives of the parties will be made within the period of seventy-two (72) hours (excluding Saturdays and Sundays) after receipt of the written summons to arbitrate. The decision may be issued by the Arbitration Committee or by the Fifth Member, as is agreed by the parties in each case. Said decision will be final and compulsory for all parties and persons related to the case.

This process allows approximately 28 days from incident to submission of the case to the Arbitration Committee.[6] In a serious case such as this, the Court considers three months to be a reasonable time to allow for the arbitration decision. The contract with Wackenhut had a 24-hour termination provision. Therefore, we conclude that PRMMI would have reinstated the plaintiffs within four months of their dismissals, *i.e.*, June 12, 1986. The damages accruing after June 12 should be paid by Local 1575.

The termination of Local 1575's responsibility obviously coincides with the termination of the collective bargaining agreement, September 30, 1986. Although the Court has here held that the plaintiffs are entitled to the protection of the collective bargaining agreement, the plaintiffs were not entitled to inclusion in the bargaining unit for any subsequent contract, against the will of PRMMI. The company is therefore liable for damages from February 13 to June 12, 1986. The Union is liable for

damages from June 13 to September 30, 1986.

The parties held a Settlement Conference on December 17, 1986, and stipulated, *inter alia*, to the following:

1. Johnny Mariani, Santiago E. Cortés, Iván Cuevas Gerena, Ismael Ramos Ortiz, Pablo Rodríguez Rosario, and Santos Rivera Rivera were paid $16.08, average hourly rate. They could have worked 1,320 hours in the 7½ months (5 shifts per week, 40 hours each, for 33 weeks = 1,320 hours). Each would have received $21,225.60 (1,320 × $16.08 = $21,225.60), and the group would have earned $127,353.60 (6 × $21,225.60).

2. Fourteen employees, Manuel Class Castro, Rafael Carrillo Carrillo, Efraín Rodríguez Rivera, Angel Cancel Cruz, Juan A. Maestre García, José Dolores Rosario Avilés, Angel Luis Hernández Hernández, Manuel A. Guzmán Justiniano, Ignacio Alejandrino Caraballo, Domingo Chaparro Quiles, Carlos Silva, Domingo Mariani, José William Otero, and Juan Acevedo Izquierdo were paid $16.08. They could have worked 792 hours in the 7½ months (3 shifts per week, 24 hours each, for 33 weeks = 792 hours). Each would have received $12,735.36 (792 × $16.08), and the group would have earned $178,295.04 (14 × $12,735.36).

3. Two employees, Antonio Torres and Israel Rodríguez Molina, were first substitutes. They would have worked 2 shifts per week at $16.08 per hour. Each would have received $8,490.24 (16 hours at $16.08 for 33 weeks). The group would have earned $16,980.48.

4. Two employees, Wilfredo Colón Vélez and Leonardo Mas Rivera, alleged three shifts. The parties were to agree on definite details or otherwise. The Court ordered the defendant to submit payrolls showing previous immediate employment.

5. Two employees, Rafael Reyes Ríos and Carmelo Sosa Cedres, alleged two shifts.

---

**6.** Two days for informal settlement, 10 days for submitting a written complaint, an indeterminate time to schedule a meeting (approximately one week is reasonable), five days for submission to arbitration, and three days for selection of the Arbitration Committee.

The parties reached no agreement with respect to René Mas Cintrón and Héctor M. Chaparro Reillo.

The Clerk is hereby ORDERED to enter Judgment in the amounts stipulated for groups 1, 2 and 3 above. The plaintiffs shall submit proof of damages, supported by documentation or affidavit, with respect to Wilfredo Colón Vélez, Leonardo Mas Riera, Rafael Reyes Ríos, Carmelo Sosa Cedres, René Mas Cintrón, and Hector M. Chaparro Reillo, by July 30, 1988. Judgment shall be entered in these amounts unless the defendants show cause for altering the figures by August 15, 1988.

The Union is advised that it will be subject to contempt of Court if it obtains or tries to obtain payment in any form or manner directly or indirectly from the employer of the Judgment entered herein against the Union.

### V. *Cross Claim by PRMMI*

The defendant PRMMI filed a cross-claim, asking that Local 1575 be liable for the entire amount of damages. The court's discussion of the breach of contract and the duty of fair representation, above, precludes the cross-claim. The cross-claim is therefore DISMISSED.

### VI. *Conclusion*

The plaintiff's Motion for Summary Judgment is hereby GRANTED. The cross-claim of defendant PRMMI is hereby DISMISSED. Judgment shall be entered pursuant to this Opinion and Order upon further proof of damages.

IT IS SO ORDERED.